# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

KESHANNA D. STATEN as administrator
 Of the Estate of Karon Nealy, Jr.
      Plaintiff

v.

Scott Semple, Commissioner of the Connecticut
Department of Correction in his individual and
Official capacities; and Dr. Gerald Valletta;
CO Olsen, CO Franco Pannofino, CO Pierce;
CO Martinez and John Does #1 - #10
all in their individual capacities


      Defendants.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

JULY 26, 2018

## COMPLAINT

### Preliminary Statement

This is a civil rights action filed by Keshanna D. Staten, the administrator of the Estate of

Karon Nealy, Jr., a deceased prisoner, for damages and injunctive relief under 42 U.S.C. § 1983,

alleging denial and delay in medical care in violation of the Eighth Amendment to the United

States Constitution. All defendants acted with wanton disregard for Plaintiff's life, recklessly and

maliciously.


### Subject Matter Jurisdiction and Venue

1.  Jurisdiction over Plaintiffs' claims is based on 42 U.S.C. § 1983, 28 U.S.C. § 1331 and

28 U.S.C. § 1343, and 28 U.S.C. § 1367 (pendent claims).

2.   Plaintiff Staten brings this action claiming deprivations of rights to be free from the deliberate indifference and cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States of America.

3.   Venue in this District is proper under 28 U.S.C. § 1391 because Defendants, at all times relevant to the complaint, are in based in the district and all activities relevant to this complaint occurred in this District.

**Parties**

4.   Decedent Karon Nealy, Jr. was an inmate at Manson Youth Institute (hereinafter "MYI"), 42 Jarvis Street, Cheshire, Connecticut. MYI is a level 4 high security facility that serves as the primary location for inmates under the age of 21.

5.   Before serving time at MYI, Decedent Nealy was an inmate at Bridgeport Correctional Institute ("BDC").

6.   Defendant John Alves, at all times relevant to this complaint, is and was the warden at MYI. As the warden at MYI, Defendant Alves was in the position to supervise all corrections officers at MYI. Defendant Alves' failure to act on information indicating that unconstitutional acts were occurring makes him liable for deliberate indifference.

7.   Defendant Alves, as the supervisor of all corrections officers at MYI, failed to supervise his subordinates who committed such wrongful acts.

8.   Plaintiff Staten can show an affirmative link between Defendant Alves' inaction and the injury to the decedent Karon J. Nealy.

9.   Defendant Gerald Valletta is a medical doctor who at all relevant times to this action was employed by the University of Connecticut Medical Center, Correctional Managed Health Care ("CMHC" or sometimes "UConn/CMHC").  Dr. Valletta is sued in his individual capacity.

10. Defendant Valletta is normally the principal physician at Garner Correctional Institution in Newtown, Connecticut.

11. Upon information and belief, during the spring and summer of 2015, the times relevant to this Complaint, MYI lacked a principal physician, and Dr. Valletta acted as a visiting physician providing primary care to inmates at MYI like Decedent Nealy.

12. CMHC and the Connecticut Department of Correction (hereinafter "DOC") were parties to a Memorandum of Agreement ("MOA") that contained the guidelines and criteria for inmates to receive healthcare from CMHC.

13. Defendant Corrections Officer ("CO") Olsen is a corrections officers who at all relevant times to this action was employed by the DOC at MYI. CO Olsen is sued in his individual capacity.

14. Defendant CO Franco Pannofino is a corrections officers who at all relevant times to this action was employed by the DOC at MYI. CO Pannofino is sued in his individual capacity.

15. Defendant CO Martinez is a corrections officers who at all relevant times to this action was employed by the DOC at MYI. CO Martinez is sued in his individual capacity.

16. . Defendant CO Pierce is a corrections officers who at all relevant times to this action was employed by the DOC at MYI. CO Pierce is sued in his individual capacity.

17. Defendant John Does #1 - #10 are both corrections officers who at all relevant times to this action were employed by the Department of Correction at MYI and medical staff who were employed by CMHC at MYI. They are sued in their individual capacities.

18. Defendant Scott Semple, at all times relevant to this action, was and remains the commissioner of the DOC. He is sued in both his individual and his official capacity. Defendant Semple can be properly served at 24 Wolcott Hill Road, Wethersfield, Connecticut 06109.

19. Plaintiff maintains that the deprivation and violations of the decedent's constitutional rights were carried out pursuant to the rules, regulations, customs, policies and practices of defendant Semple acting under the color of state law, and Defendant Semple knowingly caused plaintiff to be deprived of his constitutional rights.

20. Defendant Semple was a supervisor of all corrections officers in the DOC, and his failure to act on information indicating that unconstitutional acts were occurring makes him liable for deliberate indifference.

21. Defendant Semple, as the supervisor of all corrections officers in the DOC, failed to supervise his subordinates who committed such wrongful acts.

22. Plaintiff Staten can show an affirmative link between Defendant Semple's inaction and the injury to the Decedent Karon J. Nealy.

23. Defendant Semple failed to defer to the opinions of medical professionals like Dr. Kathleen Maurer, who told him inmate medical care was insufficient and likely to lead to irreparable harm to certain incarcerated individuals.

24. Each defendant was acting under color of law at all times relevant to this action.

**Personal Jurisdiction**

25. This Court has personal jurisdiction over all Defendants in this case as this case arises out of federal question jurisdiction, 28 U.S.C. § 1331, for the 42 U.S.C. § 1983 claims, and pendant jurisdiction, 28 U.S.C. § 1367, for the state law claims.

**General Allegations**

26. Upon information and belief Decedent Nealy was housed at the Bridgeport Detention Center.

27. Upon information and belief, at some point during his incarceration at Bridgeport Detention Center (hereinafter "BDC"), Decedent Nealy began to complain to medical and custody staff about chronic and painful headaches.

28. While at BDC, Decedent Nealy's body became extremely fatigued and weakened.

29. Decedent Nealy's acquaintances among the inmate population, like Terrance Mitchell, did not know how gravely ill Nealy was, but Mitchell said he just knew by looking at how pale Nealy's skin was that something was wrong with Nealy.

30. Upon information and belief, Decedent Nealy frequently begged medical and custody staff for medical attention but was denied.

31. Upon information and belief, Decedent Nealy submitted multiple medical request slips but was never seen by a physician.

32. Upon information and belief, while at BDC, cellmate Javon Danzy noticed Decedent Nealy's rapidly deteriorating condition. Danzy and Nealy were old friends from Waterbury.

33. Cellmate Danzy testified that Decedent Nealy complained of headaches, but that the correctional staff refused to accommodate Decedent Nealy's requests to go to medical.

34. Cellmate Danzy told the correctional officers in the unit Danzy and Decedent Nealy were in that if they did not get Nealy medical attention, he would pull the sprinkler system. Correctional staff responded to Danzy that he should do what he needed to do.

35. Decedent Nealy complained to his cellmate Danzy "Oh, cuz, I feel like I'm going to die." Danzy said that corrections' staff was sitting watching television and laughing, so he pulled the sprinkler.

36. Cellmate Danzy was ultimately punished for his attempt to get medical attention for Decedent Nealy. Danzy said "I don't want to watch him [Nealy] die. I don't know what's going on with him."

37. Danzy reported seeing Nealy with patches of hair missing from his head, a symptom typical in lupus.

38. Upon information and belief, in 2015 after his incarceration at BDC, Decedent Nealy was transferred to MYI.

39. Upon information and belief, Decedent Nealy was housed in C-Cottage, C wing at MYI.

40. Upon information and belief, Decedent Nealy was serving a two-year sentence, but only had to serve nine months of it. He was slated for release in September 2015.

41. Upon information and belief, while at MYI in the later winter and early spring of 2015, Decedent Nealy began to turn pale and lose his hair. Hair loss is a symptom of lupus.

42. Danzy was not cellmates with Nealy at MYI, but Danzy knew Nealy's cellmate Calvin Cooper.

43. Cooper testified that he was cellmates with Nealy for about three months, from March 2015 until June 2015, right before Nealy went into a coma.

44. Cooper testified that Nealy could not do any physical activity because Nealy said his body hurt. When Nealy did try to do a push-up, Cooper said he could hear Nealy's bones crack.

45. Cooper testified that he would crack Nealy's back for him every day, since Nealy's back was stiff regularly.

46. At one point, Nealy stopped eating and he got skinny. Cooper knew Nealy to have an appetite, so Cooper told Nealy to put medical slips in, but Cooper said they only sent Nealy back to the cell with ibuprofen.

47. Cooper said Nealy told him that Nealy was going to stop going to medical because they only gave him pills.

48. Nealy ended up getting punished and going into segregation or solitary confinement in the "box", and when he returned, Cooper said Nealy was skinnier than ever, and Cooper would provide Nealy with food.

49. Cooper said Nealy's hand in handshakes was cold to the touch and his fingernails were gray or blue. Lack of circulation in the extremities is a common symptom in lupus.

50. Decedent Nealy, prior to his death, got into a minor altercation that landed him in segregation at MYI.

51. Upon information and belief, Nealy and an another inmate argued during lunch, and upon information and belief, Nealy's illness was evident in the fact that he did not respond rapidly and immediately to an inmate spitting in his lunch tray.

52. Upon information and belief, the segregation cottage at MYI, cottage B, is unsanitary, and despite the fact that Nealy should have been monitored more carefully, his condition worsened significantly while he was in solitary confinement.

53. Cooper said Nealy had no appetite for breakfast or lunch, and that Nealy should go to medical because not being hungry is not normal.

54. After a week of living together, Cooper had to help Nealy onto the top bunk. Cooper used to call Nealy "old man" because Nealy was physically ailing and his bones would crack when he stood up and walked.

55. Cooper even told his grandmother about Nealy's health, and Cooper's grandmother said Nealy needed medical help.

56. Cooper said it was virtually pointless to go to medical because the staff only did cursory examinations and "They don't do nothing in jail but give us pills." Cooper said it was also pointless to raise the issue of Nealy's health to passing Lieutenants or Captains, because nine out of ten times the passing officers would wave the inmate off, and Cooper said you could tell by their whole demeanor that they did not care, so there is no point in telling them.

57. Cooper personally saw Nealy fill out three medical slips, but Cooper said Nealy only received ibuprofen. Cooper said Nealy told him he went to medical one day and asked the nurse, "Why do they keep giving me pills? Nealy told Cooper the nurse said it was going to make him feel better, but Nealy was feeling pain. Nealy said he told the nurse they should have given him a full body scan or something to see what was wrong with him, since the pills were not working.

58. Cooper said Nealy stayed in bed most days. Cooper said Nealy complained that every bone in his body hurt, that he was weak and that he could not eat.

59. Cooper said corrections officers would come by and check the doors every 15 to 30 minutes, and they would see that Nealy was not moving out of his bed.

60. At another time in the month before Nealy went into a coma, the corrections officers opened the door to let Nealy out to go to medical, but he was too tired to go, and corrections officers were made aware he was too tired to go to medical.

61. Cooper said that Nealy's body would shake.

62. Cooper was in the C wing when the prison called a code white and saw Nealy rolled out. As Nealy passed by, Cooper said he called Nealy's name and Nealy was passed out and did not respond. Cooper said he never saw Nealy alive again.

63. The next day, Cooper resumed his job of cleaning the wing, and he said inmates told him they smelled feces in his cell, and that Nealy was stuck to the bed with bodily fluids.

64. Malik Flowers was Decedent Nealy's older brother, and in MYI at the same time as Nealy prior to Nealy's death.

65. Flowers said Nealy told him Nealy sent three slips to medical, at least one for the pains in his back, but that they hadn't seen Nealy.

66. Flowers said that Nealy would tell him his bones hurt and that it was hard for Nealy to get out of bed.

67. Flowers stated that others in prison told him Nealy urinated himself in bed, fell out of the bed and started having a seizure and foaming at the mouth so the corrections officers had to put him in a wheelchair.

68. Upon information and belief, Decedent Nealy was eventually provided with a medical pass for a bottom bunk due to his deteriorating physical condition.

69. Brandon Longo was Decedent Nealy's cellmate for two days and Longo testified he never saw Nealy out of his bed when they were rooming together. Longo said he knew there was something wrong with Nealy as soon as he moved into the cell. Nealy was deformed, and "skinny as hell. It was terrible," Longo said.

70. When Nealy went to shake Longo's hand, Longo said Nealy was shaking.

71. Longo said that he had to read Nealy's mail to him, because Nealy was so unwell that Nealy could not read.

72. Longo testified he wrote Nealy's sick call, and that Nealy complained all the time to corrections officers as they walked by Nealy would yell "CO I need help. I don't feel good."

73. Longo said that the COs did not respond, and that Nealy told Longo he knew he was dying.

74. Longo saw Nealy's blood in the toilet after Nealy vomited. When Longo showed the corrections officer the blood in the toilet, the corrections officer identified it as mucus. But Longo was certain it was blood.

75. Upon information and belief, Decedent Nealy was also provided a medical pass for single cell housing due to his deteriorating physical condition.

76. Longo reported that Corrections Officers treated Nealy as if he was on a hunger strike. Yet Longo said inmates were on Nealy's side and constantly tried to get the attention of corrections officers to bring Nealy to medical.

77. On or about June 27, 2015, Decedent Nealy urinated himself, began foaming at the mouth and suffered a seizure. This episode necessitated Decedent Nealy being taken to the infirmary.

78. Longo was in a different cell in the same unit and block and he heard other prisoners saying "You can't fuck with him [Nealy] like that."

79. Upon information and belief, Correctional Officer Martinez struck Decedent Nealy several times on the head and told Decedent Nealy to "stop faking it" as he transported Decedent Nealy to the infirmary.

80.  On or about June 27, 2015, Decedent Nealy was transported to John Dempsey Hospital in Farmington, Connecticut.

81. That day, Plaintiff Staten went to MYI to visit her son, but could not do so because she was told the prison was in a lock down.

82. Prison authorities waited three days to tell Plaintiff Staten that her son Decedent Nealy had been transferred to John Dempsey Hospital in Farmington.

83. Plaintiff Staten had to wait more than a week before she could first visit her son at the hospital.

84. When Plaintiff Staten saw her son, he was awake and alert. He said to her "Ma, I don't wanna die." Plaintiff Staten told her son that he was not going to die. Decedent Nealy, without speaking, then gave her a look that she had seen in her son before, that said "Ma, you don't know what you're talking about."

85. A few days later, Plaintiff Staten heard from Decedent Nealy's doctors that he was unresponsive. Decedent Nealy's doctors never told Plaintiff Staten what was wrong with her son.

86. Plaintiff Staten never spoke to her son again.

87. Decedent Nealy died on July 27, 2015. Plaintiff Staten went to the hospital to visit him, and he was unresponsive. A doctor whose name Plaintiff Staten does not know told her that there was nothing else that could be done and the machine would have to be unplugged.

88. Plaintiff Staten did not learn of the cause of death until at least 10 months after the publication of an article in the Hartford Courant on June 15, 2017 which identified the cause of death as pulmonary aspergillosis.

89. Upon information and belief, Plaintiff Staten, through previous counsel, attempted to obtain Decedent Nealy's medical record through DOC but was unsuccessful.

90. The medical examiner's autopsy stated that Nealy died from pulmonary aspergillosis complicating steroid therapy for treatment of systemic lupus erythematosus.

91. Systemic lupus erythematosus, also known as lupus, is a chronic disease that causes systemic inflammation affecting multiple organs.

92. Plaintiff Staten said that Decedent Nealy had no medical history of lupus prior to entering MYI.

11

93. Lupus affects the immune system so that the immune system misfires and attacks the patient's own tissues in a process called autoimmunity or "loss of self-tolerance."

94. In lupus, as an attack, or flare up, progresses, all branches of the immune system join the fight, leading to intense and significant inflammation.

95. While lupus can be difficult to detect, a high index of suspicion is important. People with lupus often have symptoms that are not specific to lupus, including fever, weight loss, fatigue, blood clots, hair loss, heartburn, stomach pain and poor circulation.

96. Additional symptoms include rashes, mouth sores, arthritis, lung or heart inflammation, kidney problems, neurological issues (seizures, strokes or psychosis) and abnormal blood tests.

97. Primary care physicians should also be aware of photosensitivity in patients as a sign of lupus.

98. The standard of care, based on symptoms, is to have a series of blood tests done, including a blood screening called ANA. A positive ANA screening will lead to additional blood specific tests seeking antibodies to Anti-dsDNA and anti-Sm, which will lead to a diagnosis of lupus.

99. The aim of treatment in lupus is to induce remission, and treatment depends on the type of symptoms and their severity. Common treatments include nonsteroidal anti-inflammatory drugs (NSAIDS) to decrease swelling, joint pain, fever and inflammation of the heart and lung linings.

100.    Other treatments include antimalarial drugs, corticosteroids and immune suppressants, biologics and combinations of these treatments.

101.    Diagnosis of lupus can take as little as a week, or as long as a decade. But applying the proper standard of care without delay, lupus is diagnosable and treatable.

102.     Fungus infection occurs in patients treated with immunosuppressants and steroids, especially in high doses of steroids. Prevention of fungal infections further depends on judicious employment of antibiotics, vigorous treatment of wounds and cautious use of steroids.

103.     The clinical characteristics of fungus infection include pulmonary symptoms, pyrexia and progressive deterioration in the clinical state of the patient. Early diagnosis of the fungal infection depends on a persistent search for the infecting fungi.

104.     The finding of hyphae (branching filaments of the mycelium of a fungus) in the sputum of a systemic lupus erythematosus patient with a suggestive clinical picture should lead to bronchoscopy, bronchoalveolar lavage, and lung biopsy. Proof of diagnosis will come from the demonstration of hyphae in tissues and isolation of aspergillus from tissue cultures. Long-term therapy with amphotericin B alone or in combination with fluorocytosine or itraconazoled may help improve survival.

105.     Infection is the major cause of morbidity and mortality in the lupus patients.

106.     Aspergillus spores are ubiquitous in the environment and may become concentrated in institutional ventilation systems, like hospitals or correctional facilities. Colonization in normal hosts can lead to conditions like asthma or allergic bronchopulmonary aspergillosis. Normal people rarely develop invasive disease.

107.     Aspergillosis is a well-known opportunistic infection in immunosuppressed patients, yet actual infection may be rare. Yet fungal disease often complicates lupus following the initiation of immunosuppressive therapy. The risk factors for aspergillosis include high grade disease activity, granulocytopenia, use of steroids and other immunosuppressive treatment and presence of bacterial infection.

108.     Delayed diagnosis of aspergillosis leads to death.

109.     The MOA defined the community standard of care as "Healthcare provided to inmate patients shall be consistent with the generally accepted practice in the State as recognized by healthcare providers in the same or similar general specialty as typically utilized to treat or manage a particular health care condition."

110.     DOC Medical Director Dr. Kathleen Maurer testified in a deposition on May 18, 2018 that the community standard of care is important because it provides a consistent pattern of care for patients who are within the responsibility of a care provider.

111.     Defendant Semple was made aware and understood that the care being given to inmates by CMHC doctors and medical staff was substandard.

112.     Dr. Maurer testified that the DOC had an obligation to ensure that the community standard of care applied to patient care for inmates.

113.     Dr. Maurer further testified that the MOA had an enforcement mechanism including financial holdbacks but the amount of dollars to hold back to insure compliance was very small and that furthermore, holdbacks did not seem to be something that could be done between state agencies.

114.     Dr. Maurer stated under oath that she repeatedly voiced her concern to Defendant Semple that the inmates were not receiving care that met the community standard of care.

115.     Dr. Maurer testified that she reviewed various cases that would come to her attention that raised her concerns about the failure of CMHC to meet the community standard of care.

116.     Delay of care was a repeated concern that came to Dr. Maurer's attention as she reviewed medical cases in the DOC.

117.     Dr. Maurer testified that under the MOA, she had no authority to force CMHC to take corrective action. Dr. Maurer did not know if DOC had the authority to force CMHC to take corrective action.

118.     Dr. Maurer testified that there is a long distance between bad health outcomes and the MOA, but the distance could be travelled.

119.     Dr. Maurer testified that there was essentially no way to hold doctors accountable for their violations of the standard of care.

120.      At one point in time, the problems with healthcare delivery had become apparent within DOC leadership, and the Connecticut General Assembly demanded that the DOC issue a Request for Information ("RFI") to discover new companies that might contract with DOC. Dr. Maurer testified that she continued to ask about the RFI, but after one such meeting, and Defendant Semple responded to her on more than one occasion that "We cannot embarrass our state's flagship university." Dr. Maurer testified that she interpreted Defendant Semple's response that she was to trade inmate health care for UConn's reputation.

121.     Dr. Maurer testified that she had concerns there would be consequences for her if she embarrassed UConn and the health care delivery system within the DOC.

122.     When a person like Karon Nealy dies while in custody of the DOC, the DOC performs a security investigation.

123.     CMHC did periodic peer reviews of its medical staff, but Dr. Maurer realized after time that these peer reviews did not reflect an accurate view of the cases. Dr. Maurer saw after a number of cases that what a security investigation and her own DOC form would consider a violation of the standard of care, Dr. Wu's staff at CMHC when reviewing the same case would say there were no violations of policy and procedure.

124.     During post-mortem investigations by the DOC, Decedent Nealy's medical care was flagged as being below the standard of care. The DOC flagged numerous concerns regarding CMHC policy and protocol, and CMHC/UCMC submitted a corrective action plan to DOC Health Services following Decedent Nealy's passing.

125.     As of this point, DOC has not made public any of these investigations.

126.     At some point, Dr. Maurer realized that UConn leadership had influence over DOC management. She was told by Dr. Trestman that there are many standards of care, and she responded to that by asking for exterior peer reviews.

127.     For two to three years, Dr. Maurer tried to get external peer reviews as a means of accountability to improve patient care. When that failed, Dr. Maurer asked for $50,000 to conduct her own external peer reviews. She wanted to take 25 cases and have them reviewed for $2,000.00 per case.

128.     Commissioner Semple told Dr. Maurer he did not have the money for this review. So Dr. Maurer began searching for external sources of funds. She found that the National Institute of Corrections could provide her a $10,000.00 grant to fund the peer reviews.

129.     Dr. Maurer wrote a letter asking for the grant and Commissioner Semple had to sign it. Commissioner Semple never signed the letter. Dr. Maurer had asked Defendant Semple multiple times for peer reviews, and he demurred.

130.     Instead, Commissioner Semple commissioned the Attorney General's office to perform the peer reviews of 25 of the worst cases of medical malpractice and neglect by CMHC medical staff in the DOC system.

131.     Tim Bombard, then Dr. Kathleen Maurer's assistant in the DOC, collected the information on the 25 cases that Dr. Maurer wanted peer reviewed. After he collected the data

and stored it on his computer, he discovered that all the files had been deleted. Although the files were recovered, Dr. Maurer expressed concerns that the deletion may have been an aggressive act to prevent the peer review.

132.     Defendant Semple hired the Criminal Justice Institute, Inc. (CJI) of Hagerstown, Maryland to review the 25 cases. CJI was retained by the Office of the State Comptroller for $63,000.00, paid out of the Department of Correction budget.

133.     But by claiming that this was a legal review of cases in litigation, or thought to lead to litigation, Defendant Semple could hide the results of the peer review under attorney-client privilege and attorney-client work product doctrine, despite Dr. Maurer's repeated requests for a peer review that could help create accountability with CMCH.

134.     Plaintiff Staten has not been able to see the peer reviewed report which describes the faults in the care her son Decedent Nealy received.

135.     Defendant Semple refuses to waive the attorney-client privilege in this instance because the effects of public release of this information as to how badly inmates like Decedent Nealy were treated would embarrass him and many other powerful people in Connecticut.

136.     Upon information and belief, Karon Nealy's case of neglect and delay in care was one of these 25 cases that was peer reviewed, meaning that it was one of the 25 worst cases of medical treatment by CMHC in the DOC system in 2014 and 2015.

137.     Hiding the peer review of Decedent Nealy's treatment under the attorney-client privilege prevents Plaintiff Staten from knowing precisely what happened to her son, and from understanding precisely how bad the medical care her son received was.

138.     Upon information and belief, the CJI report reviewing Decedent Nealy's case concluded the care he received was so bad that consequences should attach to the providers.

139.     The failure to release the CJI peer review of Decedent Nealy's case has damaged Plaintiff Staten in multiple ways, including that she does not know the identities of all of the medical providers who denied or delayed care to her son, Decedent Nealy, so that she cannot name them all here in this lawsuit.

140.     Defendant Semple intended to hide the peer review report because it contains information damaging and embarrassing to UConn.

141.     On September 14, 2017, Defendant Semple swore under oath in an affidavit to the Connecticut Freedom of Information Commission that the purpose of the contract with CJI was "to provide information to Attorney O'Neill so that he could provide legal advice to me and to the agency regarding inmate healthcare." This justified Defendant Semple's use of the attorney-client privilege to hide the findings of the CJI report.

142.     Six months later, on February 20, 2018, Defendant Semple testified before the Connecticut General Assembly's Appropriations Committee that the money spent on the CJI report was "To review the files of the 25 cases and to examine if the health care that was delivered was appropriate and to make recommendations to us as to what we should be considering in the future to improve our health care delivery system." Defendant Semple then claimed that he asserted the attorney-client privilege on the CJI report because there are some aspects of these files in litigation.

143.     Defendant Semple's claim of attorney-client privilege in paragraph 140, supra, contradicts his assertion of attorney-client privilege in paragraph 141, and the two cannot be reconciled. Defendant Semple cannot say to the General Assembly that the review was a medical review and at the same time claim it was a report containing legal recommendations.

144.     Defendant Semple's attempt to use attorney-client privilege to hide the peer review of Decedent Nealy's case violates the public trust.

145.     This cover-up demonstrates that the DOC is using attorney-client privilege to protect UConn's reputation, and to place UConn's reputation over the medical care received by Decedent Nealy.

### Count I - 42 U.S.C. § 1983 Deliberate Indifference Failure to Supervise as to Scott Semple

146.     Paragraphs 1 through 144 are incorporated by reference as if more fully set forth herein.

147.     In 2014, after serving as warden of the state's mental health prison, on or about August 29, 2014 Defendant Semple was named deputy commissioner for operations and rehabilitative services in the DOC. In this role, Defendant Semple oversaw the daily operations of the 15 correctional facilities in Connecticut.

148.     This experience gave Defendant Semple a wealth of knowledge about the shortcomings of the health care delivery system in the DOC.

149.     Defendant Semple was first named acting commissioner of the state's largest agency, the DOC, in August 2014 by Governor Dannel P. Malloy.

150.     Governor Malloy named Defendant Semple commissioner of the DOC permanently on January 21, 2015.

151.     Connecticut General Statutes § 18-81 designates the Commissioner of the DOC with responsibility to oversee all aspects of service to inmates in DOC custody, including healthcare.

152.     To accomplish this aim, the MOA between the DOC and the UCHC for the Provision of Health Services to Offenders through Correctional Managed Health Care was first created in 1997.

153.     Defendant Semple knew the DOC lacked sufficient management and informational tools to manage, monitor and evaluate the performance of UConn/CMHC under the MOA.

154.     Defendant Semple never supervised or instructed anyone on his staff to create and establish sufficient management and informational tools to manage, monitor and evaluate the performance of UConn/CMHC under the MOA.

155.     Defendant Semple knew the MOA was not defined in sufficient detail to specify the services to be provided by UConn/CMHC and the performance standards for assessing UConn/CMHC's compliance.

156.     Defendant Semple never supervised or instructed anyone on his staff to define in sufficient detail the specific services to be provided by UConn/CMHC and Defendant Semple never instructed or supervised anyone on his staff to draft and establish appropriate performance standards for assessing UConn/CMHC's compliance.

157.     Defendant Semple knew that the contractual terms and performance standards in the MOA were vague and could not establish measurable and verifiable performance standards for compliance.

158.     Defendant Semple never supervised or instructed anyone on his staff to draft, establish and implement measurable and verifiable performance standards for compliance with the MOA.

159.     Defendant Semple was tasked with attending executive committee and management committee meetings, but during the times at issue, these meetings were held irregularly, and Defendant Semple did not attend them regularly.

160.     Defendant Semple never trained or supervised anyone to attend those meetings and implement proper management structures for the MOA.

161.     Defendant Semple knew that the budget in the MOA was inadequate for managing the healthcare cost of more than 14,000 inmates.

162.     Defendant Semple knew that UConn/CMHC, in the case of inmate deaths, was allowed to evaluate its own performance. Defendant Semple knew that an effective MOA would include an independent review of death cases.

163.     Upon information and belief, Defendant Semple only initiated an independent review of death cases at the insistence of Dr. Maurer, and when Defendant Semple did initiate the independent review of death cases, it was after Decedent Nealy's death and, as alleged previously, Defendant Semple purposely hid the results behind the attorney-client privilege to avoid the bad publicity associated with the DOC failing to provide appropriate care to inmates in its custody.

164.     Defendant Semple knew that DOC had never reviewed many parts of the MOA, and only assumed that UConn/CMHC was complying with the provisions of the MOA.

165.     Defendant Semple never instructed or trained anyone on his staff to review all aspects of compliance with the MOA.

166.     Defendant Semple knew that DOC was not managing the UConn/CMHC MOA with appropriate diligence.

167.     Defendant Semple never instructed or trained anyone on his staff to manage the MOA with appropriate diligence.

168.     Defendant Semple knew that the absence of measureable performance standards prevented DOC from assessing UConn/CMHC's performance, and subjected the DOC to liability for failure to provide care.

169.     Defendant Semple never instructed or trained anyone on his staff to implement measureable performance standards into the MOA.

170.     Collectively, all of Defendant Semple's failures with regards to oversight of the MOA created a lax atmosphere of noncompliance, and wanton and willful disregard for human life within the

UConn/CMHC. Defendant Semple needed to have implemented better supervision in the course of managing and implementing the MOA in order to prevent the needless deaths like that of Decedent Nealy.

171.     Defendant Semple did not want to offend the University of Connecticut and implement effective monitoring of the MOA. Defendant Semple told Dr. Maurer not to embarrass the state's flagship institution, which is the University of Connecticut. Defendant Semple told Dr. Maurer to place the school's reputation over that of inmate health care.

172.     Defendant Semple failed to supervise employees under his control who could have and should have been implementing effective monitoring of the MOA.

173.     The MOA was repeatedly extended by amendments, and on April 10, 2013, the Department of Correction extended it through June 30, 2015.

174.     Defendant Semple was regularly made aware by Department of Correction personnel, including Dr. Maurer, that the MOA was unenforceable, poorly written and was a direct cause of inmates in the care and custody of the DOC receiving subpar medical treatment that was known to endanger human life.

175.     In 2012, Defendant Semple was part of a committee that helped draft a strategic plan for UConn/CMHC. This strategic plan noted extensive challenges with the delivery of inmate healthcare.

176.     Nevertheless, the 2015 Strategic Plan for the Department of Correction does not even mention the word health care. [1]

177.     Nevertheless, on June 26, 2015, despite Defendant Semple's awareness of the unenforceability of the MOA, and despite his first-hand knowledge of the regular, repeated failures of UConn/CMHC to provide adequate care to inmates, Defendant Semple instructed deputy commissioner Cheryl Cepelak to extend the MOA.

---

[1] http://portal.ct.gov/DOC/Common-Elements/Common-Elements/Publications

22

178.     Decedent Nealy died a month after this extension was executed.

179.     Defendant Semple knew that by signing this extension, he was endangering the lives of inmates like Decedent Nealy.

180.     Defendant Semple knew that inmates received inadequate care from the medical system he oversaw, yet Defendant Semple continued to engage UConn/CMHC as the main care provider for inmates like Decedent Nealy.

181.     Defendant Semple's failure to supervise employees properly regarding the implementation of the MOA directly resulted in the death of Karon Nealy.

182.     The numerous violations of the community standard of care that UConn/CMHC subjected Decedent Nealy to was a direct result of Defendant Semple's continued failure to oversee and monitor the MOA properly.

183.     Defendant Semple knew that failure to measure the performance of UConn/CMHC under the MOA presented inmates with life threatening dangerous conditions, but Defendant Semple did not act.

184.     Defendant Semple's failure to act with the knowledge that his failure to act placed inmate in grave danger constituted deliberate indifference.

185.     Decedent Karon Nealy and Plaintiff Keshanna Staten were damaged by Defendant Semple's deliberate indifference.

186.     Decedent Karon Nealy is an entirely foreseeable victim of Defendant Semple's deliberate indifference and Defendant Semple's failure to supervise his staff regarding the implementation of the MOA.

187.     Defendant Semple's policies and practices of allowing an MOA he knew to be ineffective at helping prisoners in medical distress combined with his failure to appropriately supervise his staff regarding the MOA created an unreasonable risk of Eighth Amendment injury to Decedent Nealy and Plaintiff Staten.

188.     Defendant Semple was clearly aware that such an unreasonable risk was created and existed.

189.     Defendant Semple was indifferent to that risk of Eighth Amendment injury to Decedent Nealy.

190.     Plaintiff Staten's injury – Decedent Nealy's death – resulted from Defendant Semple's policy and practice of failing to supervise employees regarding the implementation and monitoring of the MOA.

191.     This count is asserted against Defendant Semple in his individual capacity only.

192.     Defendant Semple was consciously aware of the fact that he created or allowed a substantial risk to inmates like Decedent Karon Nealy.

193.     Notwithstanding each Defendant Semple's conscious awareness of the risk to inmates like Plaintiff Staten's Decedent Nealy, he failed to take necessary and appropriate steps to reduce or eliminate the risk.

194.     Defendant Semple allowed a culture of deliberate indifference to run rampant through all of his prisons, so that all staff under his supervision ignored serious medical needs of prisoners like Decedent Nealy. Defendant Semple failed to supervise and manage his staff in a way so that every corrections officer understood and knew how to respond and prioritize medical health situations like that faced by Decedent Nealy.

195.     Defendant Semple violated Karon Nealy's rights under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy resulting in his death.

196.     In the manner described above, Defendant Semple subjected Plaintiff Staten's decedent to deliberate indifference in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count I of this Complaint, Plaintiff Staten demands judgment against Defendant Scott Semple and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

### Count II – 42 U.S.C. § 1983 Deliberate Indifference as to Dr. Gerald Valletta

197.     Paragraphs 1 through 196 are incorporated by reference as if more fully set forth herein.

198.     Upon information and belief, Defendant Valletta failed to provide an appropriate level of medical care to Decedent Nealy.

199.     Upon information and belief, Defendant Valletta failed to examine and understand what was happening with Decedent Nealy.

200.     Defendant Valletta knew that there were no consequences to him for failure to provide proper medical care to Decedent Nealy.

201.     Defendant Valletta knew that there was no oversight by CMHC or DOC over his provision of care to Decedent Nealy, and thus he did not have to do any work on Decedent Nealy's case because there would be no consequences for him if the care Decedent Nealy received was poor.

202.     Defendant Valletta did not utilize an appropriate index of suspicion when examining Decedent Nealy.

203.     Defendant Valletta was consciously aware of the fact that he created or allowed a substantial risk to Decedent Nealy.

204.     Notwithstanding Defendant Valletta's conscious awareness of the risks to Decedent Nealy, he failed to take necessary and appropriate steps to reduce or eliminate the risk.

205.     Defendant Valletta violated the rights of Plaintiff Staten and Decedent Nealy under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy's lupus.

206.     In the manner described above, Defendant Valletta subjected the Plaintiff's decedent to cruel and unusual punishment and deliberate indifference in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count II of this Complaint, Plaintiff demands judgment against Defendant Valletta and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

### Count III – 42 U.S.C. §1983 Deliberate Indifference as to CO Olsen

207.     Paragraphs 1 through 206 are incorporated by reference as if more fully set forth herein.

208.     Like all other sentient human beings in Decedent Nealy's wing at MYI, Defendant Olsen knew and could see that Decedent Nealy was unwell.

209.     Upon information and belief, Defendant CO Olsen heard Decedent Nealy's repeated entreaties for medical assistance.

210.     Upon information and belief, Defendant CO Olsen took no action to provide medical assistance to Nealy.

211.     Defendant Olsen was consciously aware of the fact that he created or allowed a substantial risk to Decedent Nealy.

26

212.     Defendant Olsen could have and should have acted to secure the provision of appropriate medical care to Decedent Nealy.

213.     Notwithstanding Defendant Olsen's conscious awareness of the risks to Decedent Nealy, he failed to take necessary and appropriate steps to reduce or eliminate the risk.

214.     Defendant Olsen violated the rights of Plaintiff Staten and Decedent Nealy under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy's lupus.

215.     In the manner described above, Defendant Olsen subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count III of this Complaint, Plaintiff Staten demands judgment against Defendant Olsen and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.


**Count IV - 42 U.S.C. § 1983 Deliberate Indifference as to CO Pannofino**

216.     Paragraphs 1 through 215 are incorporated by reference as if more fully set forth herein.

217.     Like all other sentient human beings in Decedent Nealy's wing at MYI, Defendant Pannofino knew and could see that Decedent Nealy was unwell.

218.     Upon information and belief, Defendant CO Pannofino heard Decedent Nealy's repeated entreaties for medical assistance.

219.     Upon information and belief, Defendant CO Pannofino took no action to provide medical assistance to Nealy.

220.     Defendant Pannofino was consciously aware of the fact that he created or allowed a substantial risk to Decedent Nealy.

221.     Defendant Pannofino could have and should have acted to secure the provision of appropriate medical care to Decedent Nealy.

222.     Notwithstanding Defendant Pannofino's conscious awareness of the risks to Decedent Nealy, he failed to take necessary and appropriate steps to reduce or eliminate the risk.

223.     Defendant Pannofino violated the rights of Plaintiff Staten and Decedent Nealy under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy's lupus.

224.     In the manner described above, Defendant Valletta subjected the plaintiff to deliberate indifference in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count IV of this Complaint, Plaintiff Staten demands judgment against Defendant Pannofino and prays for: (1) compensatory damages; (2) Punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.


**Count V - 42 U.S.C. § 1983 Deliberate Indifference as to CO Pierce**

225.     Paragraphs 1 through 224 are incorporated by reference as if more fully set forth herein

226.     Like all other sentient human beings in Decedent Nealy's wing at MYI, Defendant Pierce knew and could see that Decedent Nealy was unwell.

227.     Upon information and belief, Defendant CO Pierce heard Decedent Nealy's repeated entreaties for medical assistance.

228.     Upon information and belief, Defendant CO Pierce took no action to provide medical assistance to Nealy.

229.     Defendant Pierce was consciously aware of the fact that he created or allowed a substantial risk to Decedent Nealy.

230.     Defendant Pierce could have and should have acted to secure the provision of appropriate medical care to Decedent Nealy.

231.     Notwithstanding Defendant Pierce conscious awareness of the risks to Decedent Nealy, he failed to take necessary and appropriate steps to reduce or eliminate the risk.

232.     Defendant Pierce violated the rights of Plaintiff Staten and Decedent Nealy under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy's lupus.

233.     In the manner described above, Defendant Pierce subjected the plaintiff to deliberate indifference in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count V of this Complaint, Plaintiff demands judgment against Defendant Pierce and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable

**Count VI - 42 U.S.C. § 1983 Deliberate Indifference and Cruel and Unusual Punishment as to CO Martinez**

234.　　Paragraphs 1 through 233 are incorporated by reference as if more fully set forth herein.

235.　　Like all other sentient human beings in Decedent Nealy's wing at MYI, Defendant Martinez knew and could see that Decedent Nealy was unwell.

236.　　Upon information and belief, Defendant CO Martinez heard Decedent Nealy's repeated entreaties for medical assistance.

237.　　Upon information and belief, Defendant CO Martinez took no action to provide medical assistance to Nealy.

238.　　Upon information and belief, Defendant Martinez struck Nealy in the head while he was unconscious and in a wheelchair.

239.　　Defendant Martinez was consciously aware of the fact that he created or allowed a substantial risk to Decedent Nealy.

240.　　Defendant Martinez could have and should have acted to secure the provision of appropriate medical care to Decedent Nealy.

241.　　Notwithstanding Defendant Martinez's conscious awareness of the risks to Decedent Nealy, he failed to take necessary and appropriate steps to reduce or eliminate the risk.

242.　　Defendant Martinez violated the rights of Plaintiff Staten and Decedent Nealy under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy's lupus.

243.     In the manner described above, Defendant Martinez subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count VI of this Complaint, Plaintiff Staten demands judgment against Defendant Martinez and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count VII - 42 U.S.C. § 1983 Deliberate Indifference as to John Does #1 to #10**

244.     Paragraphs 1 through 243 are incorporated by reference as if more fully set forth herein.

245.     Upon information and belief, additional defendants John Does # through #10 objectively and subjectively knew that Decedent Nealy had serious health needs.

246.     Upon information and belief, certain Defendant John Does heard Decedent Nealy's repeated entreaties for medical assistance.

247.     Upon information and belief, certain Defendant John Does took no action to provide medical assistance to Nealy.

248.     Certain Defendant John Does knew and understood that Nealy was ill, since they opened his cell to allow him to go to medical, but saw that he was too ill to even go to medical, and Defendant John Does still did not insure that Nealy got medical care.

249.     Upon information and belief, a number of the additional defendants John Does #1 though #10 worked in the medical unit at MYI and failed to provide the proper care to Decedent Nealy.

250.     Upon information and belief, a number of the additional defendants John Does #1 though #10 worked as Corrections Officers at MYI and failed to provide the proper care to Decedent Nealy.

251.     All the additional John Doe Defendants were consciously aware of the fact that they created or allowed a substantial risk to Decedent Nealy.

252.     All the additional John Doe Defendants could have and should have taken action to secure the provision of appropriate medical care to Decedent Nealy.

253.     Notwithstanding All the additional John Doe Defendants conscious awareness of the risks to Decedent Nealy, they failed to take necessary and appropriate steps to reduce or eliminate the risk.

254.     All the additional John Doe Defendants violated the rights of Plaintiff Staten and Decedent Nealy under the Eighth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Decedent Nealy's lupus.

255.     In the manner described above, Defendants John Does #1 through #10 subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Eighth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.


WHEREFORE, on Count VII of this Complaint, Plaintiff Staten demands judgment against Defendants John Does #1 through #10 and prays for: (1) a tolling of the statute of limitations on all John Does pled in this this count until they can be properly identified; (2) compensatory damages; (3) punitive damages; (4) attorneys' fees and (5) such other relief as the Court deems fair and equitable.

**Count VIII – Preliminary and Permanent Injunction as to Defendant Scott Semple in his Official Capacity**

256.     Paragraphs 1 through 255 are incorporated by reference as if more fully set forth herein.

257.     Due to Defendant Semple's attempt to conceal the CJI Report and its information about Decedent Nealy's death, Plaintiff Staten has been unable to determine all the identities of the defendants who were responsible for the death of Decedent Nealy.

258.     Despite Plaintiff Staten's best attempts, she has been unable to uncover the names of all the persons responsible for the deliberate indifference which led to the death of her son, Karon Nealy, because Defendant Semple and others under his command have hidden or concealed information.

259.     For Plaintiff Staten to win her deliberate indifference claims, she must surmount a bar of proof that amounts to criminal recklessness. (see *Hernandez v. Keane*, 341 F.3d 137, 144 (2d. Cir. 2003)).

260.     As of this point, neither Defendant Semple nor anyone involved in the health care given to Decedent Nealy have been charged with a crime.

261.     Nevertheless, Plaintiff Staten alleges conduct herein that is the equivalent of criminal conduct. Defendant Semple, then, by using the attorney-client privilege to shield the CJI report from public view, is trying to hide the equivalent of criminal conduct behind attorney-client privilege in order to prevent public disclosure.

262.     Plaintiff Staten has limited information as to the circumstances leading up to her son's death. Plaintiff Staten has not been able to obtain any reports from the Department of Correction about her son's death.

263.     Plaintiff Staten's inability to learn what is in her son's medical records or in the CJI reports has irreparably harmed, since at the time of the expiring of the statute of limitations in this case, she still does not know the names of all the people involved in the death of her son, through no fault of her own.

264.     Defendant Semple use of the attorney-client privilege to hide a peer review of her son's care has damaged Plaintiff Staten and prevents her from obtaining all the names of the defendants in this case in a timely manner.

265.     Defendant Semple is using the attorney-client privilege to shield the equivalent of criminal conduct.

266.     Defendant Semple's harm is less than that which Plaintiff Staten suffers and continues to face.

267.     Plaintiff Staten's request for injunctive relief and a release of the CJI Report will benefit the public interest.

268.     Parallel to this action, Plaintiff Staten has filed a claim for the wrongful death of her son Decedent Nealy with the Claims Commissioner of the State of Connecticut under Chapter 53 of the Connecticut General Statutes.

269.     The Claims Commissioner has not ruled on this claim yet, so the State of Connecticut has agreed to toll the statute of limitations before the Claims Commissioner because discovery has not been completed in that case, and indeed, the state of Connecticut has not provided any medical records to date in that case.

WHEREFORE, on Count VIII of this Complaint, Plaintiff Staten demands judgment against Defendant Scott Semple in his official capacity and prays for: (1) a declaratory ruling that the CJI Report should not be protected by Attorney-Client privilege and the attorney work

product doctrine under the crime-fraud exception; (2) a preliminary and  permanent injunction ordering Defendant Semple to release the CJI Report in its entirety; (3) nominal damages; (4) punitive damages; (5) attorneys' fees and (6) such other relief as the Court deems fair and equitable.

### Demand for Jury Trial

Plaintiffs hereby request a trial by jury of all issues triable by jury.

Dated: July 26, 2018

Respectfully submitted,

/s/ *Kenneth J. Krayeske*
Kenneth J. Krayeske, Esq.
Kenneth J. Krayeske Law Offices
255 Main Street, Fifth Floor
Hartford, CT 06106
(860) 969-4911
FAX: (860) 760-6590
attorney@kenkrayeske.com
Federal Bar # CT28498

/s/ *DeVaughn L. Ward*
DeVaughn L. Ward
Ward Law LLC
363 Main Street, 4th floor
Hartford, CT 06106
860-869-4086
Fax: 860-471-8406
Email: dward@attyward.com
Federal Bar # CT30321