## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KESHANNA D. STATEN,
*Plaintiff*,

v.

SCOTT SEMPLE, Commissioner of the
Department of Correction, in his individual
and official capacities; and DR. GERALD
VALLETTA; CO OLSEN; CO FRANCO
PANNOFINO; CO PIERCE; CO
MARTINEZ; and JOHN DOES 1-10, all in
their individual capacities,
*Defendants*.

No. 3:18-cv-01251 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT
## AND MOTION FOR SANCTIONS

Keshanna D. Staten, administrator of the Estate of Karon Nealy, Jr., ("Plaintiff") filed a

Complaint against Scott Semple, Commissioner of the Connecticut Department of Correction

("DOC") in his individual and official capacities; Dr. Gerald Valletta; Correctional Officer

David Olsen[1]; Correctional Officer Franco Pannofino; Correctional Officer Pierce[2]; Correctional

Officer Eduardo Martinez; and John Does #1-#10[3] seeking damages and injunctive relief under

---

[1] Parties use both "Olsen" and "Olson" to describe Defendant David Olson. The Court will use the spelling from Mr. Olson's affidavit. *See* Ex. 21 to Defs.' Mot. for Summ. J., ECF No. 85-22 (Aug. 14, 2020).

[2] Counsel for Defendants filed an appearance for Correctional Officer Pierce, but subsequently were unable to identify him or her. *See* Defs.' Mot. for Summ. J., ECF No. 85 at 1 n. 2 (Aug. 14, 2020) ("Defs.' Mot.").

[3] John Does #1-#10 have also not been identified or served, nor are they represented by counsel for Defendants. *See* Defs.' Mot. at 1 n. 1. Defendants argue that claims against John Does #1-#10 should be dismissed for "insufficient service of process in violation of Rule 4(e)." *Id.* Ms. Staten "concedes John Does #1-#10 should be dismissed." Mem. of L. in Opp'n to Defs.' Mot. for Summ. J., ECF No. 94 at 59 (Nov. 12, 2020) ("Pl.'s Opp'n") (emphasis omitted). Ms. Staten contends that she did not become aware of the identities of the correction officers who allegedly "took no action to provide medical assistance to Mr. Nealy," *id.,* until "the statute of limitations to serve these [potential] defendants had long passed," *id.* at 60. Ms. Staten "s[eeks] to move her case forward" without amending her Complaint. *Id.* Accordingly, the Court will dismiss John Does #1-#10 from the case. *Dietz v. Bouldin,* 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.")

42 U.S.C. § 1983 for allegedly denied and delayed medical care in violation of the Eighth and Fourteenth Amendments. Compl., ECF No. 1 (July 26, 2018).[4]

Scott Semple, Gerald Valletta, David Olsen, Franco Pannofino, and Eduardo Martinez (collectively, "Defendants") now move for summary judgment. Defs.' Mot. Ms. Staten moves for sanctions against them and their counsel. Pl. Keshanna Staten's Second Mot. for Sanctions Against Defs. Scott Semple, Dr. Gerald Valletta and Their Counsel, ECF No. 74 (July 9, 2020) ("Pl.'s Mot.").

For the following reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.  The Court **GRANTS** summary judgment for Commissioner Semple and Correctional Officers Pannofino, Martinez, Olson, and Pierce, and **DENIES** summary judgment as to Dr. Valletta.

Ms. Staten's motion for sanctions is **GRANTED in part** and **DENIED in part**. The Court grants Ms. Staten leave, if she so chooses, to depose Mr. Greenwood now. Any expenses, excluding attorney's fees, associated with that deposition will be the responsibility of Defendants. The Court denies Ms. Staten's motion as to the other alleged violations.

---

[4] Because any claim for injunctive relief against any of the Defendants is moot, given Mr. Nealy's death, any claim for injunctive relief is dismissed from this case. *See Gershanow v. Cty. of Rockland*, No. 11-CV-8174 CS, 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014) ("The death of a party seeking injunctive relief will moot a case if that death 'makes it impossible for the court to grant any effectual relief whatever to a prevailing party.'" (quoting *Independence Party of Richmond Cnty. v. Graham*, 413 F.3d 252, 255 (2d Cir. 2005)); *cf. Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility. On the other hand, the transfer does not moot an action for damages." (citations omitted)).

# I.     FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background[5]

### i.     Karon Nealy

On November 18, 2013, seventeen-year-old Karon Nealy, Jr. arrived at the Connecticut Department of Correction's Manson Youth Institution ("MYI") as an accused new entry. Defs.' Local Rule 56(a)(1) Statement of Undisputed Material Facts, ECF No. 85-31 ¶ 1 (Aug. 14, 2020) ("Defs.' SMF").

Upon his entry to MYI, Mr. Nealy underwent an initial assessment, had his vital signs taken, and answered a series of background questions. *Id.* ¶ 2. Medical personnel noted that "there are no immediate/chronic medical/[mental health] concerns at this time." *Id.* ¶ 3. They also explained to Mr. Nealy how to seek health services at MYI, if needed. *Id.* He provided a urine sample for a study on sexually transmitted diseases. *Id.* There were no referrals or immediate concerns and he was not taking any medications. *Id.* Medical personnel also screened Mr. Nealy for tuberculosis. *Id.*

---

[5] As noted by Defendants, Ms. Staten has complicated the determination of admitted facts in this case by her failure to comply with Local Rule 56 in her response to Defendants' Local 56(a) Statement of Material Facts. *See* Defs.' Resp. to Pl.'s Rule 56(a)(2) Statement of Undisputed Material Facts and Additional Material Facts, ECF No. 101 at 1 (Feb. 1, 2021) ("Defs.' Reply SMF") ("Plaintiff's Local Rule 56(a)(2) Statement of Undisputed Facts fails to comply with the Federal and Local Rules of Civil Procedure in many respects, warranting all improperly supported denials and all improperly supported statements to be discarded, and all facts supported by the evidence deemed admitted." (internal citations omitted)). In the absence of meaningful citations to the record, the Court may "deem[ ] certain facts that are supported by the evidence admitted." D. Conn. L. Civ. R. 56(a)(3); *see Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (in adjudicating summary judgment, courts "must be satisfied that the citation to evidence in the record supports the assertion"); *Dolan v. Select Portfolio Servicing*, No. 03-cv-3285, 2016 WL 3512196, at *1 n.4 (E.D.N.Y. June 22, 2016) ("Where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed."); *Auguste v. Dep't of Corrections*, 424 F. Supp. 2d 363, 365 n.2 (D. Conn. 2006) (deeming defendants' fact admitted because plaintiff did not submit a Local Rule 56(a)(2) statement); *Cashman v. Ricigliano*, No. Civ. 3:02-cv-1423 (MRK), 2004 WL 1920798, at *1 n.2 (D. Conn. Aug. 25, 2004) (deeming facts in a Local Rule 56(a)(1) Statement admitted because the opposing party did not file a Local Rule 56(a)(2) Statement). The Court therefore discusses facts where admitted or where not properly objected to by Ms. Staten, and has noted, where necessary, any alleged factual disputes only where they are objected to with proper citations to the record.

On November 19, 2013, mental health professionals also examined Mr. Nealy and encouraged him to seek mental health services, if needed. *Id.* ¶ 4. Mr. Nealy declined to take a HIV rapid screen test. *Id.* ¶ 5. The medical records indicated that he had suffered a gunshot wound to his right lower leg a month before in October of 2013. *Id.*

On November 25, 2013, Dr. O'Halloran examined Mr. Nealy. *Id.* ¶ 6. His vital signs and other measures were normal, but he complained of jaw pain "pressure" and loose teeth; as a result, a Dental Consultation was submitted for him to be seen. *Id.*

On November 27, 2013, Mr. Nealy left DOC custody and returned to the home of his mother, Keshanna Staten. *Id.* ¶ 7.

On September 3, 2014, approximately nine months after his release from DOC custody, Waterbury Police arrested Mr. Nealy and charged him with Assault in the First Degree. *Id.* ¶ 8. The court set his bond at $250,000. *Id.*

In the months before this arrest, Mr. Nealy had been living with his mother. *Id.* ¶ 9.

On September 4, 2014, the day after his arrest, Mr. Nealy arrived at New Haven Correctional Center ("NHCC"), as a pre-trial detainee. *Id.* ¶ 11. During his intake screening at NHCC, he also had his vital signs taken, which were within normal limits. *Id.* ¶ 13. He denied having any medical and mental health issues and was screened for tuberculosis. *Id.*

On September 22, 2014, DOC transferred Mr. Nealy to MYI. *Id.* ¶ 14. A nurse examined him and asked a series of questions. *Id.* ¶ 74. He denied any significant medical history and taking any medications. *Id.* The nurse explained to him the procedure for submitting a sick call request and he acknowledged that he understood. *Id.* Medical personnel also screened Mr. Nealy for mental health issues and noted that he had been incarcerated for two weeks with no mental health issues, and he denied any current psychiatric issues or needs. *Id.* ¶ 75.

About ten days later, on October 2, 2014, in response to his submission of a sick call request, a Registered Nurse ("RN") examined Mr. Nealy because he complained that "the joints on [his] elbow hurt." *Id.* ¶ 76.

The RN completed a Patient Encounter/Nurse Sick Call form HR 401J dated October 2, 2014 and wrote: "+ elbow pain with movement, 7/10 pain level, but no duration." *Id.* ¶ 77. The RN also noted alopecia, a medical term for hair loss, but no details about its size or duration were provided. *Id.* The RN noted that he was "negative NTV - no nausea or vomiting," and his baseline vitals were normal. *Id.*

The RN instructed Mr. Nealy to avoid push-ups and pull-ups to prevent exacerbating the pain. *Id.* ¶ 79. The RN added his name to the MD sick call list, because of his complaints of pain, and issued him Motrin which was the nursing protocol. *Id.* ¶ 80.

Two weeks later, on October 16, 2014, a RN saw Mr. Nealy again because of "a sore throat for 3 days." *Id.* ¶ 82. The Patient Encounter/Nurse Sick Call form HR 401J noted his vital signs, temperature and weight, and his pain level was listed at 4/10 with the duration being three days, but he denied other cold symptoms and he did not have a cough, congestion or fever. *Id.* The nurse issued Mr. Nealy "Motrin 400 mg per nursing protocol." *Id.* ¶ 84.

A week later, on October 23, 2014, Mr. Nealy complained of bug bites and a nurse examined him again. *Id.* ¶ 90. No bug bites were observed. *Id.* His vital signs were not taken, but his height and weight were noted on the Patient Encounter/Nurse Sick Call form HR 401J. *Id.*

Three days later, on October 26, 2014, Mr. Nealy reported to the medical unit for a sick call encounter. *Id.* ¶ 91. He stated to an RN that he had an itchy rash, especially at nighttime. *Id.* She reported that he was "antsy," and was attempting to scratch both arms and hands; as a result, she initiated the scabies protocol. *Id.*

A month later, on November 26, 2014, Mr. Nealy was called to the medical unit for a sick call request, but he refused to go. *Id.* ¶ 92.

A few weeks later, on December 18, 2014, Mr. Nealy's name came up on the MD sick call list and he met with Dr. Valletta for the first time. *Id.* ¶ 93. Dr. Valletta is board certified in internal medicine with over eight years of experience in correctional health care. *Id.* ¶ 37. He has been providing medical care to inmates within the Connecticut Department of Correction since January 2012 and is familiar and experienced in correctional care. *Id.* After Dr. O'Halloran's retirement, Dr. Valletta had been the only doctor assigned to MYI in the fall of 2014, but in early 2015, *id.* ¶ 54, Advanced Practice Registered Nurse ("APRN"), *see* Pl.'s Opp'n at 11 (defining "APRN"), Linda Kilbot had been hired for a full time, five-day-per-week assignment at MYI, Defs.' SMF ¶ 54.

Dr. Valletta examined Mr. Nealy, although the parties dispute the thoroughness of this examination. *See id.* ¶ 94 ( "Dr. Valletta met with Mr. Nealy and asked him a series of questions to learn what his complaints were, and then he conducted a full and thorough physical examination."); Pl.'s Local Rule 56(a)(2) Statement of Undisputed Material Facts, ECF No. 94-1 ¶ 94 (Nov. 12, 2020) ("Pl.'s SMF") ( Ms. Staten "denies that Dr. Valletta asked a series of questions to discern Mr. Nealy's complaints and that Dr. Valletta conducted a full and thorough physical examination" because "Dr. Valletta . . . did not have an independent recollection of the December 2014 visit.").

Dr. Valletta testified that Mr. Nealy complained of pain in several joints, knees, shoulders, wrists, and fingers, which Dr. Valletta described as polyarthralgias. Defs.' SMF ¶ 96. Dr. Valletta also stated that Mr. Nealy complained of fatigue, but he did not have a fever, chills, or sweats, and no headaches or dizziness, nor respiratory, cardiovascular, or gastrointestinal

issues. *Id.* Mr. Nealy did not report any weight loss, genital urinary symptoms, or a rash, and he did not have any flu-like symptoms. *Id.* ¶ 97. Dr. Valletta asked Mr. Nealy questions as he examined his joints looking for signs of arthritis, but he did not find any. *Id.* ¶ 98.

Based on the medical records at the time, Dr. Valletta questioned whether Mr. Nealy's complaints were benign and temporary or due to an infectious etiology or inflammatory etiology. *Id.* ¶ 99. "In Dr. Valletta's medical opinion, there was no evidence that the reported rash was in any way related to his underlying condition." *Id.* ¶ 102. Ms. Staten denies the truth of this allegation. *See* Pl.'s SMF ¶ 102.

"After questioning and examining Mr. Nealy, Dr. Valletta was of the medical opinion that Lyme disease was possibly the cause of his symptoms, because he had multiple joint pain and fatigue, and these are very common symptoms for Lyme Disease." Defs.' SMF ¶ 105. Dr. Valletta wanted "a blood test for Lyme Disease, but since a rheumatologic cause was still possible, he also tested for [Antinuclear antibodies ("ANA")], and rheumatoid factors, to be thorough." *Id.* ¶ 107. Antinuclear antibodies and rheumatoid factor are non-specific tests that, if positive, could suggest the presence of underlying autoimmune disease or inflammatory disease. *Id.* ¶ 110. The higher the prior probability that a patient has a systemic autoimmune disease, the more likely the results of an ANA test will assist in establishing the diagnosis. *Id.* Patients may have detectable serum RF[6] in a variety of rheumatic disorders. *Id.*

Polyarticular pain in an adult is encountered frequently in clinical practice. *Id.* ¶ 108. The causes include various self-limited illnesses, as well as others that are potentially disabling and life-threatening. *Id.* A patient history and physical examination generally provide the most useful

---

[6] RF or "rheumatoid factors" are "proteins produced by [the] immune system that can attack healthy tissue in [the] body." *Rheumatoid factor,* Mayo Clinic, https://www.mayoclinic.org/tests-procedures/rheumatoid-factor/about/pac-20384800 (last visited Mar. 19, 2021).

diagnostic information, and supporting or confirmatory data are obtained from a laboratory, imaging studies or, more rarely, from a tissue biopsy. *Id.*

Dr. Valletta conducted a complete history and physical examination of Mr. Nealy, which was appropriate for a patient presenting with polyarticular joint pain, since this symptom may be the initial manifestation of a systemic illness. *Id.* ¶ 109. The list of causes of polyarticular pain is lengthy and the diagnostic possibilities can be narrowed substantially depending upon whether or not arthritis is present. *Id.* In the absence of clear-cut arthritis, the focus shifts to non-articular sources of pain. *Id.*

Dr. Valletta ordered the blood tests because of concerns with the cause of Mr. Nealy's symptoms and sought to discover that cause, or at least narrow down the possibilities. *Id.* ¶ 111.

When Mr. Nealy's blood test results came back from the lab, he reviewed them and then signed his name to acknowledge his review and consideration of the results. *Id.* ¶ 112.

The blood test results overall were normal. *Id.* ¶ 113. There was nothing of significance that was elevated or abnormal. *Id.* Cytoplasmic staining was detected, the sed rate[7] was in the normal range at 15, and his ANA was negative. *Id.* In Dr. Valletta's professional medical opinion, this was a very non-specific finding. *Id.* An ANA test is positive if it finds antinuclear antibodies in the blood. *Id.* ¶ 114. About 95% of people with lupus will test positive for antinuclear antibodies, but about 20% of people who test positive for ANA will not have lupus. *Id.* A negative result, like Mr. Nealy had, means that the test found no ANAs. *Id.* ¶ 115.

---

[7] "Erythrocyte sedimentation rate, also referred to as sed rate or ESR, is a test that indirectly measures how much inflammation is in the body." *Richter v. Metro. Life Ins. Co.,* No. 15 CV 8266 (LAK) (DF), 2017 WL 3172848, at *7 n. 14 (S.D.N.Y. Feb. 27, 2017), *report and recommendation adopted in part,* No. 15-CV-8266 (LAK), 2017 WL 3172763 (S.D.N.Y. July 24, 2017) (internal quotation marks omitted).

> In December 2014, it was Dr. Valletta's professional medical opinion within a reasonable degree of medical certainty that, based upon the information known to him at that time[,] Mr. Nealy's physical history, physical exam, and lab results, there was no urgency or requirement to conduct further tests immediately, because Mr. Nealy had a negative ANA, and overall his blood test results were quite non-specific.

*Id.* ¶ 123. Ms. Staten claims, however, that Dr. Maurer, DOC's Medical Director, *id.* ¶ 20, and her expert indicate that "Mr. Nealy should have been referred to a rheumatologist." Pl.'s SMF ¶ 123. But Dr. Valletta wanted "to wait and see if Mr. Nealy's symptoms improved with Motrin." Defs.' SMF ¶ 125; *see also* Pl.'s SMF ¶ 125 (denying because Dr. Valletta did not independently remember the encounter).

On December 30, 2014, Mr. Nealy became involved in a Code Orange, an assault on staff. Defs.' SMF ¶ 134. He allegedly became hostile and threatened correctional staff after being escorted to a cell in the Restrictive Housing Unit for making an unauthorized telephone call. *Id.* A nurse in the medical unit examined Mr. Nealy, but he denied having any injuries. *Id.* ¶ 135. The medical and mental health staff then cleared him for Restrictive Housing Unit placement. *Id.*

While he was in the Restrictive Housing Unit, the nursing staff examined him and noted no injuries, and Mr. Nealy did not express any to the nursing staff. *Id.* ¶ 136. He also refused medication offered and returned other medication that he already had. *Id.*

On January 7, 2015, a nurse in in the medical unit examined Mr. Nealy in response to a sick call request. *Id.* ¶ 141. He reported having specific pain all over his body. *Id.* He said that his neck "feels like it is going to break when [he] move[s]," and that his fingers were swollen when he wakes up, and he was worried that he may have some type of cancer. *Id.* The nurse did not observe any visible injury, but medical personnel continued to prescribe Motrin for his

complaints of pain. *Id.* Medical personnel put Mr. Nealy on the MD sick call list. *Id.* ¶ 142 (explaining that this meant Mr. Nealy would be "examined by an MD, APRN, or PA").

On February 7, 2015, Mr. Nealy was seen for another nursing sick call patient encounter. *Id.* ¶ 145. Mr. Nealy reported musculoskeletal pain throughout, with upper and lower joint pain for two to three months, pain when touched below the knee, and a pain level of 9/10. *Id.* On examination, the nurse did not observe any injury or trauma, though the left knee appeared larger than the right on touch. *Id.* ¶ 146. This left knee swelling was consistent with Dr. Valletta's December 18, 2014 analysis of edema on the left knee. *Id.* ¶ 147. The nurse issued him ibuprofen and he was put on the MD sick call list for the second time since January 7, 2015. *Id.* ¶ 148.

On February 25, 2015, Mr. Nealy's name came up on the MD sick call list and he reported to the medical unit and was examined by APRN Linda Kilbot. *Id.* ¶ 157. During this visit, Mr. Nealy told APRN Kilbot that he had generalized joint aches and pains for the past two months and intermittent headaches. *Id.* ¶ 160. She noted that his December 2014 blood test was negative for Lyme, ANA, rheumatology factors, CBC with differential, and his CMM, TSH and RPR, the latter of which is a test for syphilis, which can cause arthritis, also were all negative. *Id.* APRN Kilbot reportedly "did not order a new blood test[] because it had just been done two months earlier in December 2014, and the results were normal, except for the cytoplasmic staining, which was nonspecific finding given the negative ANA." *Id.* ¶ 161.[8]

APRN Kilbot tested Mr. Nealy's pupils to determine potential cranial nerve involvement, but they were equal and reactive to light, which is normal, thereby ruling out any disease of the

---

[8] Ms. Staten contends "[she] cannot know APRN Kilbot's thoughts[] because she did not present an affidavit here, and there is no first[-]person testimony supporting APRN Kilbot's approach anywhere in the record." Pl.'s SMF ¶ 161.

optic nerve. *Id.* ¶ 163. She also gave Mr. Nealy a neurological examination to determine any neurologic involvement, testing his cranial nerves, but they were found to be intact. *Id.* ¶ 164. She checked his bilateral knee ligaments to determine any joint disorders or arthritis, but they were also intact, and there was no crepitus, which is cracking in the joints, or any other non-normalcy. *Id.* ¶ 165. APRM Kilbot recommended that Mr. Nealy increase his fluids, avoid squats and basketball, and only do low-impact exercises, and issued him ibuprofen for the pain. *Id.* ¶ 168.

Later the same day, Mr. Nealy returned to the medical unit, but the nurse turned him away. *Id.* ¶ 171. She noted that he had been seen by APRN Kilbot earlier in the day and did not take his vital signs. *Id.*

On March 11, 2015, Mr. Nealy missed a nursing medical appointment due to being in court. *Id.* ¶ 173.

On March 18, 2015, an unidentified RN examined Mr. Nealy. He reported "generalized body aches and pains," but he said that he improved with Motrin. *Id.* ¶ 174. Motrin was continued and he was told to "follow up with any concerns." *Id.*

On March 19, 2015, Mr. Nealy had a sexually transmitted disease test. *Id.* ¶ 175.

On April 9, 2015, Mr. Nealy got into a fist fight with an inmate while in the prison school. *Id.* ¶ 179. A Code Blue was called. *Id.* He was examined by medical staff and found to have a superficial abrasion on the back of his neck. *Id.* He was stable and denied any other injuries. *Id.*

On April 17, 2015, Mr. Nealy went to court where he pled guilty and was convicted of First-Degree Assault and violating a Protective Order. *Id.* ¶ 177. The judge sentenced him to eight years in prison, suspended after two years, with six years of special probation. *Id.*

On May 15, 2015, an RN saw Mr. Nealy for a nursing sick call patient encounter. *Id.* ¶ 180. He reported to the RN that his "bones hurt, that he could not even lift stuff, play basketball, or do exercises- pushups." *Id.* He said that his pain was 6/10 and that he had seen the doctor and was put on ibuprofen but needed to be seen again. *Id.* He also reported a nosebleed. *Id.*

Mr. Nealy's vital signs were taken and were normal, but he had lost weight, down from 173.6 pounds on January 7, 2015 to 154.6 pounds that day. *Id.* ¶ 181. The RN submitted an MD sick call request for him. *Id.* ¶ 183.

On May 27, 2015, nursing staff brought Mr. Nealy to the medical unit for the MD sick call and Dr. Valletta met with him. *Id.* ¶ 186. Dr. Valletta had not seen Mr. Nealy since December 2014. *Id.*

Mr. Nealy apparently "was alert . . . . [and] able to hear and understand what he was asked, and he was able to respond verbally and converse in a normal tone without any apparent hesitation, fear, or confusion." *Id.* ¶ 189.

"Upon examination, he did not have any dizziness, fever, chills, sweating, or bowel issues, nor a rash." *Id.* ¶ 190. Dr. Valletta specifically asked Mr. Nealy if he had a rash and he denied it. *Id.* ¶ 191. Upon examination, he did not see any evidence of alopecia, a malar rash, or discoid rash, nor did he see any evidence of oral ulcers. *Id.*

Dr. Valletta examined his joints and ruled out arthritis, but acknowledged that Mr. Nealy had arthralgias, which is the sensation of pain in the joints, and some inflammation. *Id.* ¶ 193.

Dr. Valletta ordered new labs; routine hematology test, but not another test for the ANA antibody. *Id.* ¶ 194. Dr. Valletta also ordered Naproxen for Mr. Nealy's pain, replacing the ibuprofen he was taking. *Id.* ¶ 195.

Dr. Valletta ruled out Lyme disease, rheumatoid arthritis, any electrolyte disorders, anemia, elevated white cell count, and any low or high platelet count, which goes along with inflammation. *Id.* ¶ 196. Dr. Valletta also considered, but ruled out, renal disorders and neurological disorders as a possible cause of Mr. Nealy's pain. *Id.* ¶ 197.

After his examination of Mr. Nealy, Dr. Valletta planned to follow up with him in six weeks, as reflected in Dr. Valletta's May 27, 2015 progress note, but this was before he had seen the newest lab test results. *Id.* ¶ 200; *see also* Pl.'s SMF ¶ 200 (denying because Dr. Valletta did not independently remember the encounter). After his visit with Dr. Valletta on May 27, 2015, Mr. Nealy did not submit any further sick call requests. Defs.' SMF ¶ 237.

On June 4, 2015, eight days after being examined by Dr. Valletta, Mr. Nealy had another fight with an inmate. *Id.* ¶ 238. Pepper spray was used to de-escalate the fight and gain the compliance of both combatants. *Id.* Two correctional officers escorted Mr. Nealy across an MYI courtyard, while he was handcuffed behind his back and followed by a correctional officer who was operating a hand-held video camera. *Id.* Mr. Nealy was cooperative and compliant and was able to walk without difficulty. *Id.* Mr. Nealy was asked if he wanted to go to a hospital and he said no. *Id.* ¶ 239.

Correctional officers brought Mr. Nealy to a single cell and strip-searched him. *Id.* ¶ 241. He sat down on the cell bunk without a shirt while a medical nurse examined him for injuries. *Id.* She asked him a series of questions, and he denied having any injuries. *Id.* Then, a mental health provider asked him if he had any mental health issues, and he denied any mental health issues as well. *Id.*

On June 4, 2015, Dr. Valletta returned to MYI for his weekly visit and reviewed Mr. Nealy's newest lab results. *Id.* ¶ 201. The new blood test results showed an elevated sed rate of

82, and a slightly abnormal hemoglobin result. *Id.* ¶ 202. A high sed rate is a broad inflammatory

marker. *Id.* ¶ 204. Mr. Nealy had an elevated sed rate of 82, not normal for a 19-year-old man –

the top range of normal is a rate of 15 – and the hemoglobin was slightly low, by 1/10th of a

point, but lower than in December 2014, which warranted a review to rule out lab error. *Id.* ¶

202.[9]

> After reviewing these labs, Dr. Valletta changed his original treatment plan of following up in six weeks, to wanting to see Mr. Nealy at his next visit to MYI on June 11, 2015, to discuss the newest lab results in an effort to reach a diagnosis, given the lab results showing the elevated [sed] rate and slightly abnormal hemoglobin result.

*Id.* ¶ 203.[10]

> In order to have Mr. Nealy's chart available to him on his next visit to MYI on June 11, 2015, Dr. Valletta . . . put a sticky note . . . on the lab result . . . [to] alert[] the nursing staff to produce Mr. Nealy's corresponding chart and the flagged lab for Dr. Valletta so that he could evaluate everything under the context of his patient . . . and as a reminder of why he was seeing him and why he ordered the tests.

*Id.* ¶ 227.[11]

On June 11, 2015, Dr. Valletta reported to MYI, but did not meet with Mr. Nealy. Defs.'

SMF ¶ 230. In fact, Dr. Valletta never saw Mr. Nealy again. *Id.* ¶ 236.

---

[9] Dr. Johnny Wu, the Director of Correctional Managed Healthcare, *see* Defs.' SMF ¶ 34, opined that these labs could indicate a "myositis" or "some kind of abnormality going on with his muscles" or "muscle damage." Dep. of Johnny Wu, MD, Ex. C to Pl.'s Opp'n, ECF No. 93-3 at 106:23-107:3 (Nov. 12, 2020) ("Wu Dep."). Dr. Wu further opined the elevated creatine kinase could be "a mixed connective tissue disorder[,] . . . some kind of thyroid disease[,] . . . [or] some kind of parasitic infection." *Id.* at 107:10-15.

[10] Dr. Wu, at his deposition, also indicated that he would want to follow up with a patient within a week of viewing such test results. Wu Dep. at 121:21-23. Dr. Wu suggested "more blood work" and a "consult." *Id.* 107:16-25.

[11] Ms. Staten "denies that any document of any sticky note – be it original or copy - exists to verify this testimony." Pl.'s SMF ¶ 227. She alleges that "Dr. Wu was aware of sticky notes on charts, but was not sure if the note became part of the medical record" or "if sticky notes on charts was proper practice." *Id.*

On June 19, 2015, medical personnel called Mr. Nealy to the medical unit in response to a sick call request, but when a nurse attempted to hand him the Naprosen that Dr. Valletta had prescribed him for the pain, Mr. Nealy refused it. *Id.* ¶ 248; *see also* Pl.'s SMF ¶ 248 (denying the allegation as inadmissible hearsay).

On June 24, 2015, at 11:00 p.m., Correctional Officer Henry[12] was conducting a routine tour when Mr. Nealy's cellmate stopped him and said that Mr. Nealy needed medical attention. Defs.' SMF ¶ 249. Correctional Officer Henry asked Mr. Nealy if he was okay, but Mr. Nealy did not respond. *Id.* ¶ 250. Officer Henry and another correctional officer, Officer Larson,[13] entered the cell to further check on Mr. Nealy. *Id.*

On June 25, 2015, at approximately 1:25 a.m., medical personnel took Mr. Nealy to the University of Connecticut Health Center ("UCHC" or "UConn") by ambulance, where he was admitted into the emergency room in the Department of Correction wing. *Id.* ¶ 258. Dr. Valletta had not been working at MYI on the evening of June 24, 2015, or in the early morning hours of June 25, 2015, and had not been on-call. *Id.* ¶ 296.

While at the UConn Health Center, medical personnel diagnosed Mr. Nealy with systemic lupus erythematosus, an autoimmune disease in which the immune system of the body mistakenly attacks healthy tissue causing widespread inflammation and tissue damage in the affected organs. *Id.* ¶ 306. It can affect the joints, skin brain, lungs, kidneys, and blood vessels. *Id.*

On July 27, 2015, medical personnel also conducted a repeat echocardiogram, and determined that Mr. Nealy had a pericardial effusion, likely secondary to systemic lupus

---

[12] Correctional Officer Henry's first name is redacted in the incident report. *See* Ex. 19 to Defs.' Mot., ECF No. 85-20 (Aug. 14, 2020).
[13] Corrections Officer Larson's first name is redacted in the incident report. *See* Ex. 19.

erythematosus. *Id.* ¶ 322. Although observed by medical personnel in cardiology and cardiothoracic surgery, later that day, Mr. Nealy underwent sustained runs of supraventricular tachycardia,[14] followed by bradycardia[15] and pulseless electrical activity (cardiac arrest). Defs,' SMF ¶ 322.

On July 27, 2015 at 7:04 p.m., Mr. Nealy died. *Id.* ¶ 325. The death certificate identified the cause of Mr. Nealy's death: multi-organ failure, secondary to sepsis lupus and macrophage ariation syndrome, and ARDS, (acute respiratory distress syndrome, which is respiratory failure due to the rapid accumulation of fluid in the lungs). *Id.* ¶ 329.

On July 28, 2015, a post-mortem autopsy examination was conducted on Mr. Nealy's body. *Id.* ¶ 330. The autopsy identified the cause of death as Pulmonary Aspergillosis Complicating Steroid Therapy for Treatment of Systemic Lupus Erythematosus. *Id.* ¶ 330.

### ii.    Commissioner Semple

During the time of Mr. Nealy's care while in DOC custody, Commissioner Scott Semple served as acting Commissioner of the DOC, after his promotion from his position as Warden at Garner Correctional Institution, in December 2013. *Id.* ¶ 15. In this role, Commissioner Semple had responsibility for overseeing the fiscal budget and custody matters for the different correctional institutions in the state. *Id.* ¶ 16; Pl.'s SMF ¶ 16 (denying that these were Commissioner Semple's only obligations). He also had some level of control over how much money was spent on healthcare, but he was not always successful in his negotiations with the Legislature. Defs.' SMF ¶ 17.

---

[14] Supraventricular tachycardia is defined as "a tachycardia [excessively rapid heartbeat] that originates above the ventricles of the heart, as in the atria or the atrioventricular node." *Supraventricular Tachycardia*, Dictionary.com, https://www.dictionary.com/browse/supraventricular-tachycardia (last visited Mar. 17, 2021); *Tachycardia*, Dictionary.com, https://www.dictionary.com/browse/tachycardia (last visited Mar. 17, 2021).

[15] Bradycardia is defined as "a slow heartbeat rate, usually less than 60 beats per minute." *Bradycardia*, Dictionary.com, https://www.dictionary.com/browse/bradycardia?s=t (last visited Mar. 17, 2021).

Correctional Managed Healthcare ("CMHC"), through the University of Connecticut Health Center, by way of a contract entitled the Memorandum of Agreement ("MOA"), provided health care to the DOC. *Id.* ¶ 18. From August 2012 to September 2018, this contract governed all aspects of DOC inmate patient health care. *Id.*

While Commissioner Semple "did not personally oversee CMHC, its medical staff, or its provision of medical care to the inmate population in the State's DOC facilities, because he did not have any medical background," *id.* ¶ 19, he arguably "inserted himself in medical decisions regularly" and "prevented CMHC staff from entering facilities he controlled," Pl.'s SMF ¶ 19.

Commissioner Semple allegedly "relied on [the expertise of Dr. Kathy Maurer and APRN Tim Bombard, who was a member of her medical staff] to ensure that CMHC was complying with its contractual obligations set forth in the MOA, including sufficient medical provider coverage at each correctional facility necessary to meet the needs of the inmate population." Defs.' SMF ¶ 20. But Ms. Staten questions whether Commissioner Semple "ever ensured CMHC was complying with its contractual obligations." Pl.'s SMF ¶ 20.

The MOA set forth a standard of care:

> It required that the healthcare provided to inmate patients shall be consistent with the generally accepted practice in the State as recognized by healthcare providers in the same or similar specialty as typically utilized to treat or manage a particular health condition, as recommended by national specialty bodies and practice evaluation agencies and as supported by peer-reviewed published scientific research.

Defs.' SMF ¶ 21. Ms. Staten argues, however, that this was not "the only operative standard of care definition." Pl.'s SMF ¶ 21.

Commissioner Semple also allegedly "depended on Dr. Maurer to ensure that CMHC was providing this standard of care in DOC facilities," Defs.' SMF ¶ 23, and Ms. Staten "admits

that Dr. Maurer's job was to ensure that CMHC met the standard of care." Pl.'s SMF ¶ 23. There is a dispute as to whether Dr. Maurer understood that there were medical staffing issues at MYI. *Compare* Defs.' SMF ¶ 32 ("[Dr. Maurer] never told [Commissioner] Semple, or Deputy Commissioner Cepelak, that there were medical understaffing issues at MYI in 2015, because it was her understanding was that MYI was fully staffed.") *with* Pl.'s SMF ¶ 32 ("Dr. Maurer's recorded attendance at meetings where medical staffing shortages at MYI was discussed shows she knew MYI was not fully staffed . . . On July 1, 2015, Defendant Semple certainly knew that staffing was an issue with CMHC when he wrote a letter to CMHC executive director Dr. Robert Trestman, copying Dr. Maurer, demanding a report by July 31, 2016 of CMHC staffing levels at all facilities.").

Meanwhile, Dr. Valletta, who had "to work at three different facilities [which] made it difficult for [him] to keep up with the demands," Defs.' SMF ¶ 138, "did not relay these concerns to anyone else; not Commissioner Semple, not Deputy Commissioner Cepelak, not Dr. Maurer, not APRN Bombard, not anyone." *Id.* ¶ 140.

### B. Procedural History

On July 26, 2018, Ms. Staten filed her Complaint. Compl.

On November 5, 2018, Defendants filed their Answer. Answer, ECF No. 26 (Nov. 5, 2018).

On June 18, 2019, Defendants moved for a protective order. Defs.' Mot. for Protective Order, ECF No. 48 (June 18, 2019).

On October 4, 2019, Ms. Staten moved to compel production by Defendants. Pl.'s Mot. to Compel Produc. by Defs., ECF No. 53 (Oct. 4, 2019).

On December 31, 2019, Ms. Staten moved for sanctions against Defendants. Pl. Keshanna Staten's Mot. for Sanctions for Disc. Misconduct Against Defs. Scott Semple, Dr. Gerald Valletta and Their Counsel, ECF No. 57 (Dec. 31, 2019).

On January 26, 2020, the Court granted Defendants' motion for a protective order and Ms. Staten's motion to compel production and denied Ms. Staten's motion for sanctions. Order, ECF No. 59 (Jan. 26, 2020).

On February 10, 2020, Ms. Staten renewed her motion for sanctions. Pl. Keshanna Staten's Renewed Mot. for Sanctions Against Defs. Scott Semple, Dr. Gerald Valletta and Their Counsel, ECF No. 62 (Feb. 10, 2020).

On April 7, 2020, the Court denied as moot the renewed motion for sanctions as "it appear[ed] the requested discovery [had] been provided." Order, ECF No. 71 (Apr. 7, 2020).

On July 9, 2020, Ms. Staten filed a second motion for sanctions with an accompanying memorandum of law. Pl.'s Mot.; Pl. Keshanna Staten's Second Mot. for Sanctions Against Defs. Scott Semple, Dr. Gerald Valletta and Their Counsel, ECF No. 74-1 (July 9, 2020).

On July 30, 2020, Defendants opposed Ms. Staten's second motion for sanctions. Defs.' Opp'n to Pl. Staten's Second Mot. for Sanctions Against Defs. Scott Semple, Dr. Valletta, and Their Counsel, ECF No. 78 (July 30, 2020) ("Defs.' Opp'n").

On August 5, 2020, Ms. Staten replied to Defendants' opposition. Pl. Keshanna Staten's Reply to Defs.' Obj. to Her Second Mot. for Sanction Against Defs. Scott Semple, Dr. Gerald Valletta, and Their Counsel, ECF No. 79 (Aug. 5, 2020) ("Pl.'s Reply").

On August 14, 2020, Defendants moved for summary judgment with supporting documents. Defs.' Mot.; Defs.' Mem. of L. in Supp. of Their Mot. for Summ. J., ECF No. 85-30 (Aug. 14, 2020) ("Defs.' Mem."); Defs.' SMF.

On November 12, 2020, Ms. Staten objected the Defendants' motion for summary judgement and provided supporting documents. Mem. of L. in Opp'n to Defs.' Mot. for Summ. J., ECF No. 94 (Nov. 12, 2020) ("Pl.'s Opp'n"); Pl.'s SMF".

On February 1, 2021, Defendants' replied to Ms. Staten's opposition and Local Rule 56(a)(2) Statement. Defs.' Reply to Pl.'s Opp'n to Their Mot. for Summ. J., ECF No. 102 (Feb. 1, 2021) ("Defs.' Reply"); Defs.' Reply SMF.

On March 2, 2021, the Court *sua sponte* granted Ms. Staten leave to file a sur-reply addressing a recent Second Circuit decision and its impact on her supervisory liability claim against Commissioner Semple. Order, ECF No. 104 (Mar. 2, 2021).

On March 8, Ms. Staten filed a sur-reply. Pl.'s Sur-Reply to Defs.' Reply to Pl.'s Opp'n to Mot. for Summ. J., ECF No. 105 (Mar. 8, 2021) ("Pl.'s Sur-Reply").

On March 9, 2021, the Court held oral argument on the pending motions. Min. Entry, ECF No. 106 (Mar. 9, 2021).

## II.   STANDARD OF REVIEW

### A.  Motion for Summary Judgment

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine

issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) (per curiam); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" (quoting *Estate of Gustafson ex rel Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016)). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials."). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).

III.  **DISCUSSION**

   A.  **Deliberate Indifference**

Section 1983 enables a plaintiff to bring a cause of action for "redress" against any person who, under color of state law "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court has held that deliberate indifference to a prisoner's serious medical need constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment, as made applicable to the states by the Fourteenth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As a result, these claims are actionable under Section 1983.[16]

To prevail on a deliberate indifference claim, a plaintiff must prove both objective and subjective elements. *See Salahuddin v. Goord*, 467 F.3d 263, 279–81 (2d Cir. 2006).

   i.  **Objective Element**

The objective "'medical need' element measures the severity of the alleged deprivation" of medical care. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). In assessing the objective prong, there must be a determination of (a) "whether the prisoner was actually deprived of adequate medical care," and (b) "whether the inadequacy in medical care is sufficiently

---

[16] Defendants contend Ms. Staten did not properly plead a Fourteenth Amendment violation against Dr. Valletta during the time Mr. Nealy was a pre-trial detainee. *See* Defs.' Mem at 2. Ms. Staten argues that her pleadings were adequate, and Defendants waived this challenge by not specifically raising it in their Answer. Pl.'s Opp'n at 37. As will be discussed further below, the essence of Ms. Staten's claim against Dr. Valletta relates to events that occurred in 2015, when Mr. Nealy was convicted and therefore was subject to the Eighth Amendment. *See* Compl. at 25-26. Interactions or events concerning Dr. Valletta and Mr. Nealy that occurred while Mr. Nealy was a pre-trial detainee all involve the same course of treatment and may be imputed to Dr. Valletta for the entire course of treatment. As no one contests that Ms. Staten adequately pled an Eighth Amendment violation against Dr. Valletta, *see* Compl. at 25-26, and there is no independent alleged violation that occurred only while Mr. Nealy was a pre-trial detainee, Ms. Staten's deliberate indifference claim may proceed under the Eighth Amendment, but there is no basis for a separate Fourteenth Amendment claim to move forward.

serious" to constitute a constitutional violation. *Salahuddin*, 467 F.3d at 279–80. These inquiries are highly fact-specific. *See Smith*, 316 F.3d at 185.

"The objective prong requires a showing that the plaintiff's medical need or condition was 'a serious one.'" *Gonzalez v. Maurer*, No. 3:17CV1402(MPS), 2020 WL 292275, at *6 (D. Conn. Jan. 21, 2020) (quoting *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003)). For an ailment to qualify as sufficiently serious, typically, the Eighth Amendment contemplates "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted). In determining the severity of the medical need, a variety of factors are considered, including but not limited to whether the impairment is one that a reasonable doctor or patient would find important and worthy to treat, whether the condition affects the daily activities of an individual, and whether the condition is accompanied by chronic and substantial pain. *Id.* at 702–703. There also may be consideration of "the absence [or type] of adverse medical effects or demonstrable physical injury" as well as any unreasonable and very likely risk of future harm, even if physical harm is not currently present. *Smith*, 316 F.3d at 187–88 (citations omitted); *Salahuddin*, 467 F.3d at 280 ("This [objective] inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner"); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (finding the potential future health risk caused by exposure to environmental tobacco smoke could form the basis for relief under the Eighth Amendment).

In cases where interruption of treatment is at stake (as compared to no treatment at all), the harm or the risk of harm faced by a prisoner due to this temporary deprivation, rather than the nature of the underlying condition itself, must be considered. *Smith*, 316 F.3d at 185–86.

Defendants argue that "at no time during Dr. Valletta's care and treatment of Mr. Nealy . . . were Mr. Nealy's medical needs serious by any medical standard, or so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Defs.' Mem. at 39. They contend that, in December 2014, "[t]here were no medically recognized indicators that he had an illness that was a 'condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* at 43 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994)). In Defendants' view, Mr. Nealy's "physical and daily life activity at that time also ruled out him having a serious medical condition" because "[h]e was active and able to perform daily activities without any 'obvious manifestations of pain and injury.'" *Id.* (quoting *Blackmore v. Kalamasoo Cty.*, 390 F. 3d 890, 899 (6th Cir. 2004)). Defendants argue that "there was no urgency or medical requirement for Dr. Valletta to conduct further tests immediately," citing Mr. Nealy's "negative ANA" and "non-specific" blood test results. *Id.* at 44. They contend that "[w]ithout the benefit of 20/20 hindsight . . ., no one would have reasonably been able to diagnose lupus, or [in December 2014], any other serious or [r]heumatological problem." *Id.*

Defendants further argue that, in 2015, "[t]hough Dr. Valletta had no doubt that Mr. Nealy had chronic, unresolved symptoms, there were no indicators that he had a serious medical condition." *Id.* at 50. They maintain that "[a]ll of Mr. Nealy's physical examinations, tests, and blood test results to date had ruled out Lyme [d]isease, [l]upus, rheumatoid arthritis, any electrolyte disorders, anemia, syphilis, elevated white cell count, any low or high platelet count . . . , renal disorders, and neurological disorders." *Id.* Defendants argue "[w]hatever was causing his symptoms was reasonably believed to be benign, because the physical and medical tests ruled out any serious medical condition, as did his in[-]person appearance." *Id.* They contend that "there is no evidence of what triggered the sudden deterioration in Mr. Nealy's health on June

24, 2015, other than it is now known that he had a very rare and aggressive disease," but argue this diagnosis "was not known five weeks earlier on May 17, 2015[] when he did not present with any evidence of a serious medical condition." *Id.* at 52.

Ms. Staten responds that "Mr. Nealy's presentation in December 2014 with complaints of chronic pain place[s] him into the realm of an objectively sufficiently serious medical condition, sufficient to overcome summary judgement." Pl.'s Opp'n at 40. "This [pain] alone," Ms. Staten argues, "satisfies the requirement that Mr. Nealy presented to [Dr.] Valletta with a serious condition." *Id.* In addition, Ms. Staten contends that "Mr. Nealy's medical record . . . contained complaints and assessment of alopecia or body rash." *Id.* She argues that "[w]hen analyzing all these conditions in combination, in a 19-year-old young man, a reasonable trier of fact could conclude that Mr. Nealy presented to [Dr.] Valletta in December 2014 and May 2015 with a serious medical condition." *Id.* at 40-41.

Defendants reply that "the admissible evidence . . . establish[es] that at no time during Dr. Valletta's care and treatment of Mr. Nealy in December 2014 . . ., or in May 2015 . . . were his medical needs known to be serious." Defs.' Reply at 16 (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990)). They contend that "[a] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 16-17 (quoting *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir. 1990)). Defendants argue that "Mr. Nealy did not have alopecia; he had stress induced hair loss that resolved itself and is why it was never noted by any medical provider." *Id.* at 17. They also suggest that Mr. Nealy's participation in fights with other inmates indicates the lack of a serious medical condition. *Id.* at 17, 20, 22. Defendants maintain "not one of the multiple medical providers in any of [Mr. Nealy's] eleven

26

encounters noticed anything in his blood test results, chart, or complaints that suggested to them that he has a serious medical condition." *Id.* at 23.

The Court disagrees.

Although, lupus is "is generally regarded as a serious medical condition," *Wesley v. O'Connor-Ryerson*, No. 9:08-CV-0953 NAM/DEP, 2011 WL 6103031, at *7 (N.D.N.Y. Oct. 27, 2011), *report and recommendation adopted*, 2011 WL 6112131 (N.D.N.Y. Dec. 7, 2011) (also collecting cases), medical staff at MYI were unaware that Mr. Nealy had systemic lupus erythematosus during his time in MYI, *see* Defs.' SMF ¶ 306 (noting Mr. Nealy was diagnosed with systemic lupus erythematosus in the hospital). The factors used to determine whether a medical condition is serious, however, are not limited to whether the treating physician is aware of the condition, but also include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (alteration omitted).

Even without the specific diagnosis, Mr. Nealy's symptoms, which the MYI medical staff were aware of, are indicative of a serious medical condition. Mr. Nealy repeatedly complained of pain during his time at MYI. *See* Defs.' SMF ¶¶ 6, 77, 80, 96, 141, 145, 160, 174, 180, 193. This suggests "the existence of chronic and substantial pain," *Chance,* 143 F.3d at 702, sufficient to constitute a serious medical condition. Mr. Nealy's steep "degeneration," *id.,* and ultimate passing further clarify his medical condition as serious. Moreover, as discussed further below, Dr. Valletta considered Mr. Nealy's symptoms and test results serious enough to escalate his planned treatment schedule. *See* Defs.' SMF ¶ 203 ("After reviewing [Mr. Nealy's] labs, Dr.

Valletta changed his original treatment plan of following up in six weeks, to wanting to see Mr. Nealy at his next visit to MYI.").

Mr. Nealy did not have a cut or headache. *See, e.g.*, *Taylor v. Smolinski*, No. 01-CV-0158E(F), 2003 WL 21383015, at *3 n. 10 (W.D.N.Y. Apr. 18, 2003) (collecting cases where courts determined medical conditions were not sufficiently serious). He had an autoimmune disease that cost him his life. *See* Defs.' SMF ¶¶ 329-30 (noting Mr. Nealy's cause of death to be a complication related to his lupus). Despite Defendants' assertions otherwise, at minimum, there is a genuine issue of material fact as to whether Mr. Nealy had an objectively serious medical condition.

Accordingly, summary judgment cannot be granted as to Ms. Staten's deliberate indifference claim against Dr. Valletta, based on the absence of the objective element, a serious medical condition.

### ii.    Subjective Element

For the subjective element of an Eighth Amendment violation, "the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280 (2d Cir. 2006). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result" and that the charged official "must be subjectively aware that his conduct creates such a risk." *Id.* at 280-81 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Defendants argue Ms. Staten "cannot establish that Dr. Valletta . . . had a culpable state of mind when [he] 'acted or failed to act despite [his] knowledge of a substantial risk of serious harm.'" Defs.' Mem. at 54 (citing *Farmer,* 511 U.S. at 842). They contend that it is an undisputed fact that "Dr. Valletta did not know what was the cause of Mr. Nealy's complaints in December 2014[] or in May 2015" and that "he cannot be deliberately indifferent to a serious medical condition that he is unaware of." *Id.* at 56 (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 258–59 (S.D.N.Y. 2003)). Defendants point to Dr. Valletta's two examination notes as evidence that "he was acting in good faith when working toward a diagnosis." *Id.*

Defendants further argue that a different course of treatment or approach to diagnosis "is not evidence of deliberate indifference by Dr. Valletta, but rather a 'classic example of matter for medical judgment' and does not represent deliberate indifference." *Id.* at 57 (quoting *Estelle*, 429 U.S. at 107). They allege that Dr. Valletta's "actions and decisions were based on a reasonable, and exhaustive, medical approach in an effort to diagnose the cause of Mr. Nealy's complaints." *Id.* at 57-58. "Given what he knew, based on the totality of Mr. Nealy's test results in December 2014," Defendants argue that Dr. Valletta "did not believe that there was any urgency or requirement to conduct further tests immediately[] because Mr. Nealy has a negative ANA, and over[all] his blood test results were quite non-specific." *Id.* at 58. They contend that "[i]f his medical opinions constituted an incorrect diagnosis, it is not actionable under [Section] 1983." *Id.* (citing *Bridges v. Keller*, 519 F. App'x 786, 787–88, (4th Cir. 2013)).

Defendants then argue that Mr. Nealy did have any of the criteria for diagnosing lupus and "Dr. Valletta did not believe, within a reasonable degree of medical certainty, that there were indicators that Mr. Nealy had a serious illness at that moment." *Id.* at 61-62. "But even if his medical opinion was wrong," Defendants maintain that "this would not be sufficient to establish

deliberate indifference." *Id.* at 62 (citing *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005)). Defendants conclude that "[t]here was nothing that Dr. Valletta could have done to change the course of what happened to Mr. Nealy when he was at MYI given the information known to him at that time." *Id.* at 69-70.

Defendants also contend that Dr. Valletta intended to follow up with Mr. Nealy on June 11, 2015, but did not meet with him because "the nursing staff did not give [him] Mr. Nealy's chart to review." *Id.* at 62. They argue that "[i]f Mr. Nealy's chart had been provided to Dr. Valletta with the labs, he would likely have met with Mr. Nealy on June 11, 2015, and he would have likely repeated them to be sure that the high [sed] [r]ate and a slightly low hemoglobin were actually abnormal and not a lab error." *Id.* at 63 (citing Defs.' SMF ¶ 231). They suggest that "Dr. Valletta would likely have done some supplemental tests and submitted a request for him to be examined by a rheumatologist." *Id.* (citing Defs.' SMF ¶¶ 233-34). In their view, however, even if Dr. Valletta had met with Mr. Nealy on June 11, 2015, "the outcome would not have been any different [because] [h]e had a very rare and aggressive disease." *Id.* at 63-64.

Ms. Staten argues that for deliberate indifference under the Fourteenth Amendment for pre-trial detainees, "a Plaintiff is required to show that the Defendant recklessly failed to act with reasonable care to mitigate the risk even though the defendant should have known 'that the condition posed an excessive risk.'" Pl.'s Opp'n. at 42 (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)). She contends that Dr. Valletta was not "certain if he had actually reviewed all the nursing notes from the visits of October [2014]" and "testified that during his tenure with CMHC, he had not reviewed entire medical records of patients because he's been too busy." *Id.* at 42-43. "[T]hese admissions coupled together," Ms. Staten argues, "could lead a reasonable trier of fact to believe that [Dr.] Vallet[t]a failed to review Mr. Nealy's prior medical encounters when they met in December 2014." *Id.* at 43. Relying on her own expert, *see* Aff. of Homer

Venters, MD, Ex. O to Pl.'s Opp'n, ECF No. 93-15 (Nov. 12, 2020), and the DOC Security

Division's interview with Dr. Valletta after Mr. Nealy's death, *see* Ex. S to Pl.'s Opp'n, ECF No.

93-20 (Nov. 12, 2020), Ms. Staten argues that this is "far below the reasonable standard of care

to mitigate Mr. Nealy's complaints," Pl.'s Opp'n. at 43.

Ms. Staten further contends that "by failing to specify a[] follow up timeframe, and with

full knowledge of the prolonged wait times for follow up, Dr. Valletta erred in a manner that

significantly delayed diagnosis and care for Mr. Nealy." *Id.* at 44. Ms. Staten maintains that Dr.

Valletta "had full knowledge of lengthy waiting time for MD Sick Call at MYI" and

"acknowledged follow up was delayed because he was only there once a week." *Id.* She argues

that "[t]he consequence of the delay in care was Mr. Nealy's death." *Id.*

Ms. Staten raises similar arguments in the context of Eighth Amendment deliberate

indifference, arguing "evidence establishes that [Dr.] Valletta was well aware that he was

practicing medicine in an environment that presented an excessive risk to inmate health and

safety," but "continued to see inmates in this manner." *Id.* at 46. She contends that "if [Dr.

Valletta] were at MYI more than once a week, he would have followed up on [Mr.] Nealy's

abnormal blood work in May of 2015." *Id.* at 49. Ms. Staten also argues that Dr. Valletta's

proposed course of treatment after the May 2015 meeting--more lab testing and a follow up in

six weeks--was insufficient according to her expert, Dr. Venters, and Dr. Valletta should have

quickly referred Mr. Nealy to a specialist. *See id.* at 47, 49.

Ms. Staten also argues that after reviewing Mr. Nealy's newest lab result in June 2015,

"[Dr.] Valletta could have very well saw Mr. Nealy, but he did not" and instead, Dr. Valletta

"attempts to shield responsibility for his failure to alter treatment by passing the buck on the

nurses who he worked with in MYI." *Id.* at 48. She contends that "[a]n elevated sed rate is a

serious medical condition that requires prompt attention and follow up." *Id.* at 49.

Defendants reply that "[t]he evidence establishes that Dr. Valletta was not even

indifferent, let alone deliberately indifferent, to known serious medical needs of Mr. Nealy" and

"[h]is actions were extensive and thorough in his effort to arrive at a diagnosis." Defs.' Reply at

24. They argue

> Plaintiff cannot meet her burden of proof, because Dr. Valletta's
> course of treatment did utilize an appropriate index of suspicion that
> was based upon medically recognized factors . . . [and] the results
> of the tests in his effort to diagnose the cause of the symptoms for
> his patient[,] Mr. Nealy.

*Id.* at 25. They further contend that "it is not deliberate indifference for a doctor to try and

diagnose a patient's condition." *Id.* at 26.

The Court disagrees as to the Eighth Amendment claim for deliberate indifference against

Dr. Valletta.

As a preliminary matter, there is nothing in this record sufficient to create a genuine issue

of material fact as to Ms. Staten's arguably alleged Fourteenth Amendment deliberate

indifference claim, even if properly pled. Indeed, there is no record evidence of a causal

connection between any actions taken or not taken by Dr. Valletta, while Mr. Nealy was a

pretrial detainee, that resulted in his subsequent death when he was a convicted felon. In the

absence of such record evidence, any such claim must be dismissed. *See Lloyd v. City of New*

*York*, 246 F. Supp. 3d 704, 720 (S.D.N.Y. 2017) ("Based upon the evidence in the record,

however, a reasonable jury could not conclude that [the treating doctor] 'knew or should have

known' that his actions or omissions pertaining to a single examination of Plaintiff 'posed an

excessive risk to [her] health or safety.' (second alteration in original) (quoting *Darnell*, 849 F.3d

at 35)). If anything, the record evidence, at best, only would support a disagreement over the course of Mr. Nealy's treatment, evidence insufficient to create a genuine issue of material fact on a deliberate indifference claim. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

As to Ms. Staten's alleged Eighth Amendment deliberate indifference claim for actions taken by or not taken by Dr. Valletta, when Mr. Nealy was a convicted felon, the record evidence is markedly different.

After seeing Mr. Nealy in May 2015, Dr. Valletta ordered more lab work. Defs.' SMF ¶ 194. Upon reviewing these lab results, by Defendants' own admission, Dr. Valletta

> [C]hanged his original treatment plan of following up in six weeks, to wanting to see Mr. Nealy at his next visit to MYI on June 11, 2015, to discuss the newest lab results in an effort to reach a diagnosis, given the lab results showing the elevated [sed] rate and slightly abnormal hemoglobin result.

*Id*. ¶ 203. Dr. Valletta thus knew that Mr. Nealy's potential illness could be harmful if not more closely examined sooner than six weeks. A reasonable jury then could determine that Dr. Valletta had "awareness of a substantial risk of the harm," because these results were serious, if he did not follow up with Mr. Nealy before the original six-week timeline. *Salahuddin*, 467 F.3d at 280 ("The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices."); *see also* Wu Dep. at 106:23-107:15 (discussing illnesses like "a mixed connective

tissue disorder," "thyroid disease, and "parasitic infection" that could have caused such test results).

Dr. Valletta then admits that "[i]n order to have Mr. Nealy's chart available to him on his next visit to MYI on June 11, 2015, [he] did what he usually did and put a sticky note, such as 'Chart please,' on the lab result" to "alert[] the nursing staff to produce Mr. Nealy's corresponding chart and the flagged lab for Dr. Valletta so that he could evaluate everything under the context of his patient . . . and as a reminder of why he was seeing him and why he ordered the tests." *Id.* ¶ 227. "The following week, June 11, 2015, Dr. Valletta reported to MYI, but the nursing staff did not give Dr. Valletta Mr. Nealy's chart to review, and Mr. Nealy was not brought to the medical unit, so Dr. Valletta did not meet with him as he had planned to do." *Id.* ¶ 230.

A reasonable jury thus could find that this failure to follow up with Mr. Nealy was deliberate indifference. *See* Wu Dep. at 121:21-23 (indicating that that the follow up after reviewing such test results should be "probably within a week"); Dep. of Kathy Maurer, MD, Ex. F to Pl.'s Opp'n, ECF No. 93-6 at 141:20:142:8 (Nov. 12, 2020) ("Maurer Depo.") (indicating that Mr. Nealy was not referred to a specialist early enough in his care "given his set of clinical complaints"). And although Defendants characterize this as a failure on the part of the nursing staff, a reasonable jury also could determine that it was Dr. Valletta's responsibility, not that of the nursing staff, to follow up with a patient whose illness he subjectively deemed serious enough to escalate the schedule of care. The issue is not what someone else should have done, but what Dr. Valletta should have done.

Indeed, "[a] defendant may not escape liability if the evidence shows that he 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm

inferences of risk that he strongly suspected to exist.'" *Ruffin v. Deperio*, 97 F. Supp. 2d 346,

354 (W.D.N.Y. 2000) (quoting *Farmer,* 511 U.S. at 843 n. 8). By not following up with Mr.

Nealy, Dr. Valletta could have been deliberately indifferent because he "declined to confirm

[his] inference[] of [the] risk [to Mr. Nealy] that he strongly suspected to exist" when he flagged

his lab results. *Id.; see also Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (finding

that the subjective element required a showing that the treating physician "knew that [the inmate]

had some serious medical problem which bore further investigation"). In any event, there is a

genuine issue of material fact as to Dr. Valletta's deliberate indifference to Mr. Nealy's serious

medical condition.

Accordingly, the Court finds that Defendants have failed to show Dr. Valletta's

entitlement to summary judgment on Ms. Staten's Eighth Amendment deliberate indifference

claim.

### B. Supervisory Liability

"It is a well-established principle that 'personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under [section]

1983.'" *Pelletier*, 2007 WL 685181, at *6 (alteration in original); *see also Wright v. Smith*, 21

F.3d 496, 501 (2d Cir. 1994); *Murphy v. State of Conn., Dep't of Public Health,*

3:04CV976RNC, 2006 WL 908435, at *2 (D. Conn. Mar. 30, 2006) ("[A] suit for deliberate

indifference to a serious medical need cannot be maintained against a defendant who has no role

in the provision of medical care.").

In 1995, the Second Circuit determined that personal involvement of a supervisory

official may be shown by evidence that

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation

through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).

After 2009, however, the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), on the *Colon* factors was unclear. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but declining to specifically address the issue; *Reynolds v. Barrett,* 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon.*"); *Johnson v. White,* No. 9:14–cv–00715 (MAD)(DJS), 2015 WL 6449126, at *4 n. 2 (N.D.N.Y. Oct. 23, 2015) (noting that the Second Circuit had yet to decide the impact of *Iqbal* on *Colon*); *see also Koehl v. Bernstein,* No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at *9 (S.D.N.Y. June 17, 2011) (noting that in *Iqbal,* the Supreme Court "explicitly rejected the argument that[] 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution'" (quoting *Iqbal,* 556 U.S. at 677)).

In December 2020, the Second Circuit clarified the standard for personal involvement of supervisory officials in a Section 1983 action. *See Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). In *Tangreti*, a counselor supervisor in a prison "argue[d] on appeal that she [wa]s immune from suit under the doctrine of qualified immunity because her actions did not violate a statutory or constitutional right that was clearly established at the time of the challenged conduct,"

specifically "that her liability as a supervisor of the [prison] [wa]s not clearly established." *Id.* at 614-15 (alterations and internal quotation marks omitted).

Because under *Iqbal,* "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," 556 U.S. at 676, the Second Circuit held that "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti*, 983 F.3d at 616 (citing *Farmer*, 511 U.S. at 837). Thus, "there is no special rule for supervisory liability." *Id.* at 618. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary" and "[t]he violation must be established against the supervisory official directly." *Id.* (first alteration in original)

Applying this standard, the Court will address the issue of supervisory liability as it relates to the remaining Defendants.

### i.   Commissioner Semple

Defendants argue that Ms. Staten "fail[ed] to demonstrate the personal knowledge or personal involvement of Commissioner Semple." Defs.' Mem. at 14. Defendants contend that "there are no allegations in the [C]omplaint to establish that [Commissioner] Semple ever observed, met, or even learned about [Mr. Nealy] and his medical condition or treatment at any time prior to the filing of this action." *Id.* at 14-15. In Defendants' view, Commissioner Semple "cannot be held responsible for the medical decisions that do not fall within the responsibilities inherent in his duties as the Commissioner of DOC." *Id.* at 15.

Defendants argue that Commissioner Semple's "involvement with the Memorandum of Agreement ("MOA") between DOC and UCHC" is not a basis for supervisory liability. *Id.* at 16. In their view, "[e]ven if the Commissioner had been alerted by a letter or a monitoring report, there is no allegation that he was personally involved in the medical decisions concerning [Mr. Nealy's] care, and thus he lacks 'direct participation' as required by *Iqbal.*" *Id.* Defendants argue that "oversight responsibly for the MOA . . . la[id] with DOC's Medical Director, Dr. Kathy Mauer, and her assistant APRN Bombard." *Id.* (citing Defs.' SMF ¶¶ 16-23). According to Defendants, "Commissioner Semple's only role was to ask [Dr. Maurer] to follow-up with him on issues he thought needed to be addressed immediately, or that were more emergent, such as personnel issues, in response to Dr. Maurer's interactions and he input that she provided to him on these issues." *Id.* at 17 (citing Defs.' SMF ¶ 28). Defendants contend that any conversations between Commissioner Semple and Dr. Mauer "about staffing at Manson Youth Institution" happened in 2016 and 2017, after Mr. Nealy's passing, and "only involved behavioral mental health care, not medical care." *Id.* at 18 (citing Defs.' SMF ¶ 33).

Addressing *Tangreti,* Defendants argue that Ms. Staten's "deliberate indifference claim . . . requires an objective and subjective showing," and  "to establish the objective prong of the claim, a plaintiff must typically establish that they suffer from a serious medical condition and that the defendant was aware the plaintiff had this condition yet was deprived of constitutionally adequate medical care for that condition." Defs.' Reply at 29 n.15 (internal quotation marks omitted). They contend Ms. Staten's "arguments that [Commissioner] Semple should be held liable despite his [alleged] unawareness of Mr. Nealy's medical condition or treatment ignores the objective prong of medical deliberate indifference claims" and thus, "[her] argument . . . fail[s] in light of *Tangreti's* holding that a plaintiff must establish all 'the elements of different

constitutional violations' against each individual defendant directly." *Id.* (emphasis omitted)

(quoting *Tangreti,* 983 F.3d at 618).

> Applying the *Colon* factors, Ms. Staten argues Commissioner
> Semple knew that MYI was understaffed before he became
> commissioner, . . . admitted that [he] failed to remedy this[,] . . . was
> informed of problems at MYI with regards to health care prior to his
> elevation to commissioner, [and] thus, . . . had a duty once he
> became commissioner to remedy this.

Pl.'s Opp'n at 18-19 (citing Pl.'s SMF ¶ 397). Ms. Staten contends that Commissioner Semple

"continued to maintain UConn/CMHC as the medical provider for DOC through the MOA

despite the recommendations of the [Auditors of Public Accounts] and his own staff." *Id.* at 25;

*see also* Pl.'s SMF ¶ 23. In Ms. Staten's view, Commissioner Semple "failed to take reasonable

action." Pl.'s Opp'n at 25. Ms. Staten also argues that Commissioner Semple "failed to schedule,

hold[,] or attend regular Executive Committee meetings throughout Mr. Nealy's incarceration,"

which she "equates to grossly negligent supervision." *Id.* at 30. Ms. Staten contends that

Commissioner Semple "exhibited deliberate indifference to the rights of inmates by failing to act

upon information indicating that unconstitutional acts were occurring." *Id.* at 35.

In her sur-reply addressing *Tangreti*, Ms. Staten argues that "the Second Circuit was

careful not to state that it overruled *Colon*." Pl.'s Sur-Reply at 3. She contends "[n]either

*Tangreti* []or *Iqbal* specifically hold [Commissioner] Semple must know Mr. Nealy's personal

situation." *Id.* at 5. In Ms. Staten's view, Commissioner Semple need only know and disregard

an excessive risk to "inmate health and safety" generally rather than a specific inmate's health

and safety. *Id.* at 6-7 (citing *Tangreti*, 983 F.3d at 616; *Farmer*, 511 U.S. at 837). Ms. Staten

argues that Commissioner Semple "ignore[d] the harm his medical system posed to inmates,"

and thus "had personal involvement in that he knew of a barbaric constitutional violation, but did

not act to prevent it or remediate the damage that had been done." *Id.* at 18.

The Court disagrees.

Ms. Staten has shown that Dr. Valletta had "subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it," *Tangreti*, 983 F.3d at 616, sufficient to defeat summary judgment as to him, but not as to Commissioner Semple. On this record, Ms. Staten has only presented evidence that Commissioner Semple oversaw DOC's contracting with CMHC and UCHC, Pl.'s SMF ¶¶ 18, 19; that Commissioner Semple had some oversight responsibility for CMHC's contractual obligations, *id.* ¶ 20; and that he may have been aware of understaffing at some facilities, including MYI, *id.* ¶ 32.

Ms. Staten, however, has not presented any record evidence that Commissioner Semple "directly" knew of or interceded in Dr. Valletta's treatment of Mr. Nealy. *Tangreti*, 983 F.3d at 618 ("The violation must be established against the supervisory official directly."). While Ms. Staten argues that she need only show Commissioner Semple disregarded inmate health and safety generally rather than Mr. Nealy's health and safety specifically, Pl.'s Sur-Reply at 6, a plausible reading of *Tangreti* belies this argument. *See Tangreti,* 983 F.3d at 619 ("Tangreti must therefore establish that Bachmann violated the Eighth Amendment by Bachmann's own conduct, not by reason of Bachmann's supervision of others who committed the violation.")

There, in a case involving claims of sexual abuse by correctional officers, "the pretrial record d[id] not permit the inference that Bachmann had subjective knowledge of the risk of the sexual abuse inflicted on Tangreti and that she decided to disregard that risk." *Id.* Neither of the two observations of inappropriate interactions by Bachmann involved "a sexual interaction." *Id.* And the complaints to Bachmann did not indicate that these correctional officers "were sexually involved" with the inmate. *Id.* As a result, the Second Circuit determined that "at most it may be said that Bachmann could have or should have made an inference of the risk of sexual abuse," *id.*

40

(footnote omitted), an insufficient basis for permitting the deliberate indifference claim to go forward, *see id.* at 612 ("It is not sufficient, as the district court maintained, that Bachmann *should have known* of the substantial risk of sexual abuse." (emphasis in original)).

Here, the viable deliberate indifference claim with respect to Mr. Nealy's treatment – the genuine issue of material fact for trial – is Dr. Valletta's alleged failure to follow up with Mr. Nealy's medical care before Mr. Nealy died, after Dr. Valletta himself indicated the importance of seeing Mr. Nealy again in the medical records. *See* Defs.' SMF ¶ 194 (admitting that Dr. Valletta "changed his original treatment plan of following up in six weeks, to wanting to see Mr. Nealy at his next visit to MYI on June 11, 2015, to discuss the newest lab results in an effort to reach a diagnosis, given the lab results showing the elevated [sed] rate and slightly abnormal hemoglobin result").

There is no record evidence, however, that Commissioner Semple even knew who Mr. Nealy was, let alone that he permitted Dr. Valletta to be deliberately indifferent to Mr. Nealy's treatment or allowed Mr. Nealy to be at a substantial risk of serious harm. *See Tangreti*, 983 F.3d at 616. Significantly, the undisputed record evidence is that Dr. Valletta did not inform Commissioner Semple or "anyone else" about any staffing issues that affected the quality of care to his inmate patients, much less Mr. Nealy's. Defs.' SMF ¶ 140 ("But Dr. Valletta did not relay these concerns to anyone else; not Commissioner Semple, not Deputy Commissioner Cepelak, not Dr. Maurer, not APRN Bombard, not anyone.").[17]

At this stage of the case, in order to proceed to trial on his deliberate indifference claim against Commissioner Semple, Ms. Staten must have admissible evidence that he both knew of

---

[17] While Ms. Staten argues that Dr. Valletta should have informed someone, *see* Pl.'s SMF ¶ 140 ("Dr. Valletta had a fiduciary duty to speak if and when he saw care falling below the statutory or constitutional minimum."), that is far different from actually doing so.

and disregarded a substantial risk of serious harm to Mr. Nealy. *See Raskin v. Wyatt Co.*, 125

F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in

ruling on a motion for summary judgment." (citing *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d

1179, 1181 (9th Cir. 1988))); *eCommission Solutions, LLC v. CTS Holdings, Inc.*, —F. App'x --,

2019 WL 2261457, at *2 (2d Cir. May 28, 2019) (finding that "the admissibility of evidence on a

motion for summary judgment is subject to the same rules that govern the admissibility of

evidence at trial"); *Scheiner v. Wallace*, No. 93 CIV. 0062 (RWS), 1996 WL 633418, at *8

(S.D.N.Y. Oct. 31, 1996) (granting a motion for summary judgment where Plaintiffs introduced

admissible evidence that did not create a genuine issue of material fact). On this record, however,

Ms. Staten has only presented evidence from which a jury could only speculate as to how any

action taken or not taken by Commissioner Semple prevented Dr. Valletta from following up on

Mr. Nealy's treatment. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("'[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment . . . [M]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist.'" (alterations in

original) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995)); *see also Prunier v.

City of Watertown*, 936 F.2d 677, 680 (2d Cir. 1991) ("[A] jury may not base its verdict on mere

speculation, surmise or guesswork."). In the absence of admissible evidence of Commissioner

Semple's knowledge regarding Mr. Nealy's situation, Ms. Staten's deliberate indifference claim

against him fails.

Accordingly, the Court will grant the motion for summary judgment as to the deliberate

indifference claim against Commissioner Semple.

ii.   **Correctional Officer Martinez, Correctional Officer Olson,**
**Correctional Officer Pannofino, and Correctional Officer Pierce**

Defendants argue that Franco Pannofino, Eduardo Martinez, and David Olson were "not personally involved in the . . . alleged violation of [Mr. Nealy]'s rights." Defs.' Mem. at 19-29. With regard to Correctional Officer Pierce, Defendants contend that "no officer with the last name 'Pierce' [was] assigned to Manson Youth Institution during that time." Defs.' Mem. at 29-31. Plaintiff "[d]oes [n]ot [o]bject regarding Defendants Martinez, Ols[o]n, Pannofino, [or] Pierce." Pl.'s Opp'n at 59 (emphasis omitted). Plaintiff explains that "in the final analysis, [these correction officers] had no dealings or were not present the night of Mr. Nealy's 'code white.'" *Id.*

Because these correction officers were "not present the night of Mr. Nealy's 'code white,'" *id.*, and there is no evidence that they were "directly" involved, *Tangreti*, 983 F.3d at 618, in the medical treatment of Mr. Nealy, the only viable deliberate indifference claim on this record, as discussed above, the Court will grant summary judgment as to Franco Pannofino, Eduardo Martinez, David Olson, and CO Pierce.

**C.  Qualified Immunity**

"A government official performing a discretionary function is entitled to qualified immunity provided his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (internal quotation marks omitted). In determining whether qualified immunity applies, the Court must engage in a "two-part inquiry: [(1)] whether the facts shown 'make out a violation of a constitutional right' and [(2)] 'whether the right at issue was clearly established at the time of the defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232

43

(2009)).[18] To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (alteration omitted). If a defendant "has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity." *Spavone v. New York State Dept. of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (internal quotation marks omitted).

It is well-established before 2014 that deliberate indifference to an inmate's serious medical need or denial of adequate medical treatment was not constitutionally permitted. *See Estelle*, 429 U.S. at 104; *see also Wright v. Dee*, 54 F. Supp. 2d 199, 204 (S.D.N.Y. 1999).

"The Second Circuit has held that where factual disputes exist, a court cannot resolve the question of qualified immunity without engaging in some weighing of the evidence, a function that falls within the province of the jury." *Ruffin*, 97 F. Supp. 2d at 355 (citing *Posr v. Doherty,* 944 F.2d 91, 95–96 (2d Cir. 1991); *Calamia v. City of New York,* 879 F.2d 1025, 1035–36 (2d Cir. 1989)). As "factual disputes exist" as to Dr. Valletta's deliberate indifference to Mr. Nealy's treatment when he failed to follow up with Mr. Nealy, *Ruffin*, 97 F. Supp. 2d at 355, the Court will deny Defendants summary judgment for Dr. Valletta based on his alleged qualified immunity.[19]

### D. Sanctions

This Court "has broad latitude to determine the scope of discovery and to manage the discovery process." *EM Ltd. v. Republic of Argentina,* 695 F.3d 201, 207 (2d Cir. 2012). This

---

[18] In *Pearson*, the Supreme Court clarified that the district court may decide in its discretion the order in which the two prongs should be addressed. *See Pearson*, 555 U.S. at 236; *Hilton v. Wright*, 673 F.3d 120, 126–27 (2d Cir. 2012).

[19] Because the Court has dismissed all of the other defendants for the failure to sustain a deliberate indifference claim against them, even if there was a viable deliberate indifference claim, given the particular facts of this case and the absence of any viable case law establishing the violation of a clearly established right, qualified immunity also would result in the dismissal of any deliberate indifference claim against any defendant other than Dr. Valletta.

discretion also extends to "fashioning appropriate sanctions for discovery misconduct" in accordance with Federal Rule of Civil Procedure 37. *Iron Workers Local 12 Pension Fund v. Catskill Mountain Mech. LLC,* Civ. No. 07–CV–437 (LEK/RFT), 2008 WL 3413904, at *3 (N.D.N.Y. Aug. 8, 2008). "[Federal] Rule [of Civil Procedure] 26(g) is intended to deter and curb discovery abuses, including evasive responses, by 'explicitly encouraging the imposition of sanctions.'" *Kiobel v. Royal Dutch Petroleum Co.,* No. 02 CIV 7618(KMW)(HBP), 2009 WL 1810104, at *2 (S.D.N.Y. June 25, 2009) (quoting Advisory Committee Note, Fed. R. Civ. P. 26). Under Rule 26(g), "If a court determines that sanctions are appropriate, Rule 26(g) leaves the nature of the sanction to the court's discretion. *Id.* (citing Advisory Committee Note, Fed. R. Civ. P. 26).

Ms. Staten moves for sanctions for three reasons: (1) "[t]he deposition of Chad Greenwood did not occur prior to March 13, 2020 as ordered by th[e] Court; (2) "Defendants failed to allow [Ms. Staten's] examination of the original medical records prior to February 7, 2020; and (3) Commissioner Semple's "January 22, 2019 responses" to Ms. Staten's first set of interrogatories and requests for admissions violated Rules 26(g)(1)(A), 33(b)(3), and 33(b)(5). Pl.'s Mot. at 1-2.

As to the first claim, Ms. Staten's counsel assert that they contacted counsel for Defendants on January 24, 2020 to schedule the deposition of APRN Greenwood. Pl.'s Mem. at 7. Counsel for Defendants responded that "APRN Greenwood was out on leave" and that they would contact Plaintiff's counsel "if and when they contacted [APRN] Greenwood." *Id.* Ms. Staten's counsel contends that they never heard back from Defendants' counsel about APRN Greenwood. *Id.*

For the second claim, Ms. Staten argues that "Defendants waited until [Ms. Staten] filed a motion for sanctions" to produce for inspection original medical records. *Id.* at 8. Ms. Staten's counsel "did get to inspect the medical records," but she argues the "inspection was not in compliance with th[e] Court's mandate." *Id.*

The final claim concerns an alleged error in the responses made by Commissioner Semple. Ms. Staten argues that Commissioner Semple "has not properly certified under his . . . responses" as required by Federal Rules of Civil Procedure 33(b)(3) and 33(b)(5). *Id.* at 13. Ms. Staten also contends that Commissioner Semple "testified he read and probably signed [his responses], yet after prompting by his counsel, he altered his testimony," *id.* at 18, to say "he never saw [the responses] until his deposition," *id.* at 16.

Defendants argue Ms. Staten's "three purported grounds for sanctions are meritless," claiming "two are moot, and all are clearly being raised now to harass, annoy, and distract defense counsel." Defs.' Opp'n at 1. First, Defendants argues that they made efforts to produce APRN Greenwood for a deposition and Ms. Staten was not prejudiced by not taking the deposition. *Id.* at 3-4. Second, they contend that that the delay in the inspection of the medical regards is moot because Ms. Staten already raised this issue, had it decided by the Court, and failed to timely move for reconsideration. *Id.* at 5-6. Defendants also argue that Ms. Staten's third grounds for sanctions is moot and she was not prejudiced by the alleged violation. *Id.* 6-11.

Ms. Staten replies that prejudice is not a requirement for her motion to succeed. Pl.'s Reply at 3. She also argues that any untimeliness should be "disregarded" because of the COVID-19 pandemic generally and because Federal Rule of Civil Procedure 37(b) does not place a time limit on filing a discovery motion for sanctions. *Id.* at 5.

Regarding the deposition of Mr. Greenwood, the Court agrees with Ms. Staten. On January 26, 2020, the Court issued an order requiring all outstanding depositions to be completed by March 13, 2020. Order, ECF No. 59. Counsel for Ms. Staten contacted Defendants' counsel to schedule this deposition with Mr. Greenwood, a state employee, but Defendants allowed this deadline to pass without this deposition taking place. *See* Pl.'s Mem. at 8. At oral argument, Defendants admitted that Mr. Greenwood's deposition has still not been taken, despite the Court's clear order and Ms. Staten's motion for sanctions highlighting the issue. Min. Entry. Both the failure to produce Mr. Greenwood to be deposed by the deadline and the continued failure to produce Mr. Greenwood after the deadline violate the Court's January 26, 2020 order. Thus, sanctions in the form of leave to depose Mr. Greenwood now are warranted. *See Wisser v. Vox Media, Inc.*, No. 19 CIV. 1445 (LGS), 2020 WL 1547381, at *5 (S.D.N.Y. Apr. 1, 2020) ("A district court . . . possesses inherent authority 'to fashion an appropriate sanction for conduct which abuses the judicial process.'" (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017)).

As for the other alleged violations regarding the inspection of the medical record and Commissioner Semple's responses, the Court agrees with Defendants that these issues are moot. Ms. Staten acknowledges that she raised these issues in her previous motions for sanctions, *see* Pl.'s Mot. at 8, 12, which the Court denied or found as moot, *see* Order, ECF No 59; Order, ECF No. 71. If Ms. Staten wanted these orders reconsidered, she should have moved for reconsideration within seven days of the orders. *See* D. Conn. L. Civ. R. 7(c) (requiring motions for reconsideration be filed "within seven (7) days of the filing of the decision or order from which such relief is sought"). And, in any event, these alleged violations do not rise to the level that would require the Court to impose sanctions. *See Iron Workers Loc. 12 Pension Fund*, 2008

WL 3413904, at *3 ("[A] court has broad discretion in fashioning appropriate sanctions for discovery misconduct.").

Accordingly, the Court will grant Ms. Staten's motion as to the depositions of Mr. Greenwood and grant Ms. Staten leave, if she so chooses, to depose Mr. Greenwood now. Any expenses, excluding attorney's fees, associated with this deposition shall be the responsibility of Defendants. The Court will also deny Ms. Staten's motion as to the other alleged violations.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**. The Court **GRANTS** summary judgment for Commissioner Semple, Franco Pannofino, Eduardo Martinez, David Olson, and CO Pierce, and **DENIES** summary judgment as to Dr. Valletta.

Ms. Staten's motion for sanctions is **GRANTED in part** and **DENIED in part**. The Court grants Ms. Staten leave, if she so chooses, to depose Mr. Greenwood now. Any expenses, excluding attorney's fees, associated with that deposition shall be the responsibility of Defendants. The Court denies Ms. Staten's motion as to the other alleged violations.

**SO ORDERED** at Bridgeport, Connecticut, this 19th day of March, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE